IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No: 2:08-cr-20202-JPM |
| | ) | |
| ANTHONY E. SCOTT, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS**

This case is before the Court on remand from the United States Court of Appeals for the Sixth Circuit for further factual findings regarding evidence submitted in relation to Defendant Anthony Scott's ("Defendant" or "Scott") First Motion to Suppress Statements (ECF No. 61). The mandate is "to determine who – Scott or a member of the [Memphis Police Department ("MPD")] – initiated further discussion" after Scott had invoked his Fifth Amendment right to counsel. United States v. Scott, 693 F.3d 715, 721 (6th Cir. 2012). The mandate further states that the Sixth Circuit did not reach Defendant's claim that his statements to the MPD were coerced, therefore the Court will also address Defendant's coercion claim. See id.; (ECF No. 61 at 3-4).

# I. PROCEDURAL HISTORY

This case was commenced by the filing of a Criminal Complaint against Anthony Scott and John Scott on May 30, 2008. (ECF No. 1.) The original Complaint made the following factual assertions:

> 2.  On May 15, 2008 at 11:34 a.m. a male entered the O'Reilly's Auto Parts Store located at 5099 Yale [Road], Memphis, Tennessee. The robber was wearing dark colored facial covering, a dark jacket, and he was armed with a silver handgun. The robber threatened the store employees and demanded cash from the register and the safe. The robber took the cash and left the store. The robber got into a black Chevrolet Impala and fled the scene. A witness called the police and gave a vehicle description. The vehicle was driven by a heavy set male black.
>
> 3.  On May 28, 2008 at 4:14 p.m. a male entered the O'Reilly's Auto Parts Store located at 275 North Cleveland [Street], Memphis, Tennessee. The robber was wearing dark colored facial covering, a dark jacket, and he was armed with a silver handgun. The robber demanded cash from the register and the safe. The robber took the cash and fled the store on foot. The robber got into a Black Chevrolet Impala and attempted to flee the area. Uniformed officers from the Memphis Police Department made the scene and began checking the area. Officers stopped a black Chevrolet Impala at Poplar [Avenue] and Montgomery [Street] driven by a John Scott. Officers also located a[n] Anthony Scott on Montgomery [Street] at Larkin [Avenue]. Anthony Scott matched the physical description of the male who robbed the business. Officers checked the immediate area and located a black jacket, a black ski mask, and a loaded chrome revolver.

(Id. at PageID 2-3.)

A four-count Indictment against Anthony Scott and John Scott was filed on June 26, 2008, charging Defendants in Counts

1 and 3 with violations of 18 U.S.C. § 1951 in connection with the May 15, 2008, robbery of the O'Reilly's Auto Parts Store at 5099 Yale Road, Memphis, Tennessee, and the May 28, 2008, robbery of the O'Reilly's Auto Parts Store at 275 North Cleveland Street, Memphis, Tennessee. (ECF No. 21 at PageID 22, 24.) Counts 2 and 4 charged the Defendants with the carrying and use of a firearm in connection with the two robberies, in violation of 18 U.S.C. § 924(c). (Id. at PageID 23, 25.)

On February 11, 2009, a twenty-two-count Superseding Indictment was returned. (ECF No. 46.) Anthony Scott was named in all twenty-two counts.[1] Each of the odd-numbered counts in the superseding indictment named Anthony Scott in connection with a particular robbery, starting with the May 28, 2008, O'Reilly's Auto Parts robbery. (Id. at PageID 68, 70, 72, 74, 76, 78, 80, 82, 84, 86, 88.) Each even-numbered count named Anthony Scott in a separate related § 924(c) charge. (Id. at PageID 69, 71, 73, 75, 77, 79, 81, 83, 85, 87, 89.) On March 10, 2010, a twenty-four-count Second Superseding Indictment was filed, adding an additional § 1951 charge and an additional § 924(c) charge as to Defendant Anthony Scott. (ECF No. 110 at PageID 449-50.)

On July 16, 2009, John Scott pled guilty to Counts 1, 2, and 3 of the Superseding Indictment. (ECF No. 74.) Anthony

---

[1] John Scott was named in the first four counts of the Superseding Indictment.

Scott proceeded with a Motion to Suppress. (ECF No. 61.) The hearing on the Motion to Suppress began on November 23, 2009, and concluded on November 24, 2009. (ECF No. 85; ECF No. 86; see also ECF No. 89; ECF No. 90.) A total of four witnesses testified: Sergeant James A. "Tony" Taylor ("Taylor"), Detective Eric Hutchison ("Hutchison"), Detective Brian Beasley ("Beasley"), and the Defendant Anthony Scott ("Defendant" or "Scott"). On March 1, 2010, the Court entered an Order Denying Defendant's First Motion to Suppress Statements. (ECF No. 104.) The Second Superseding Indictment was filed nine days later. (ECF No. 74.)

On March 22, 2010, a jury trial as to Anthony E. Scott began. A total of fifty-seven witnesses testified and 106 exhibits were received. Closing arguments were concluded on Monday, March 29, 2010. (ECF No. 124.) On March 31, 2010, the jury returned a partial verdict, finding Defendant guilty on sixteen counts. (ECF No. 135.) The jury was scheduled to resume deliberations on the remaining counts on April 1, 2010, but the Government dismissed those counts with prejudice after defense counsel consulted with the Defendant and determined that they would accept the Government's dismissal. (ECF No. 131.) The Order on Jury Verdict was entered on April 1, 2010 (ECF No. 133), as was the Order Dismissing Counts 3, 4, 7, 8, 9, 10, 15, and 16 of the Second Superseding Indictment (ECF No. 139).

Defendant Anthony Scott was sentenced on July 2, 2010, to ten years as to each of Counts 1, 2, 5, 11, 13, 17, 19, 21, and 23, to be served concurrently with each other but consecutive to the required sentences in each of Counts 6, 12, 14, 18, 20, 22, and 24, which were to be served consecutively with each other and to the robbery counts for a total term of incarceration of 185 years. (ECF No. 151.) Supervised release and restitution were also imposed, as well as a special assessment. (Id.) Because of the length of the sentence, the Court recommended to the Bureau of Prisons that Defendant be incarcerated at a facility as close to Memphis as possible, so that he could be close to his family. The Judgment was entered on July 6, 2010 (ECF No. 152), and the Notice of Appeal was filed on July 7, 2010 (ECF No. 154).

Defendant's cousin and co-defendant, John Scott, was sentenced on July 13, 2010, on three counts to fifty-six months incarceration on the robbery counts (Counts 1 and 3 of the Superseding Indictment) and eighty-four months as to Count 2, for a total period of incarceration of 140 months. (ECF No. 157; ECF No. 158.)

The Sixth Circuit rendered its opinion on September 10, 2012. Scott, 693 F.3d 715. The Sixth Circuit found that the district court "did not clearly err in deciding to credit the testimony of Taylor, and not Scott, on the issue of whether

5

Scott verbally invoked his right to counsel." Id. at 718. The

Sixth Circuit, however, found that Scott invoked his right to

counsel when he signed the Miranda waiver ("Advice of Rights"

form) on May 28, 2008, and indicated "no" to the question

"Having these rights in mind, do you wish to talk to us now?"

Id. at 719. The Advice of Rights form specifically provides:

> You have the right to remain silent. Anything you say
> can be used against you in a court of law. You have a
> right to have a lawyer, either of your own choice, or
> court appointed, if you are unable to afford one; and
> to talk to your lawyer before answering any questions;
> and to have him with you during any questioning, if
> you wish.[2]

(ECF No. 64-1 at PageID 176.)

The Sixth Circuit specifically found "Scott's written

response of 'no' to the question regarding his desire to speak

with police 'articulate[d] his desire to have counsel present

sufficiently clearly.'" Scott, 693 F.3d at 719 (alteration in

original) (quoting Davis v. United States, 512 U.S. 452, 459

(1994)). The court noted,

> If there is any ambiguity about Scott's right to
> counsel, it is in the form itself, and not in his
> invocation of the right. The form used by the Memphis
> police is far from a model of clarity, and, if
> interpreted as urged by the United States, its use
> might result in some suspects waiving their right to
> counsel when they do not intend to do so.

---

[2] The form went on to state two questions:
  Q:   Do you understand each of these rights I've explained to you?
[and]
  Q:   Having these rights in mind, do you wish to talk to us now?
Scott answered the questions "Yes" and "No" respectively. (ECF No. 64-1 at
PageID 176.)

Id. at 720.  The court went on to conclude,

> Though we hold that Scott invoked his right to
> counsel, based on the facts before us, we are unable
> to conclude whether, after invoking his right to
> counsel, Scott later waived that right while in
> custody.  Under Edwards [v. Arizona, 451 U.S. 477
> (1981)], if Scott initiated further discussion with
> the police, he waived his right to counsel; if he did
> not initiate discussion, he did not waive his right to
> counsel and the police were barred from continuing
> questioning.

Id.

It is on the question of who initiated the second interview
on May 9, 2008, that this matter is returned to the district
court.

On December 12, 2012, Defendant appeared at a report date
before this Court.  (ECF No. 173.)  The Court ordered both
parties to file briefs regarding the issues remanded by the
Sixth Circuit, their proposed findings of facts and law, and
whether additional evidence needed to be received to supplement
the record.  (Id.)

Defendant filed his Notice Regarding Additional Evidence on
January 11, 2013.  (ECF No. 175.)  He stated he did "not believe
additional evidence [was] needed to address the [remanded]
issues."  (Id.)

Defendant filed his Proposed Findings of Fact and
Conclusions of Law on February 1, 2013.  (ECF No. 177.)  The
Government responded with its Proposed Findings of Fact and Law

on February 15, 2013.  (ECF No. 181.)  The Government submitted

that "the record shows that the defendant clearly initiated

contact" with the detectives, therefore the statements were

properly admitted.  (Id. at 1.)  Defendant then filed

Supplemental Proposed Conclusions of Law on February 21, 2013.

(ECF No. 182.)

   Defendant appeared before the Court again on February 26,

2013.  (ECF No. 183.)  At this report date, both parties agreed

that no argument or further evidence beyond the record was

necessary for the Court to make its findings on the remanded

issues.  (Id.)

## II.  EVIDENCE

   The evidence that is perhaps the most persuasive and most

reliable on the issue of who initiated the May 29, 2008,

interview with Anthony Scott is contained in the

contemporaneously prepared Memorandum of Detective Eric

Hutchison, a thirteen-year member of the MPD and the case agent

in charge of the "squatter robberies" at the time of his

testimony at the suppression hearing on November 23, 2009.

(Mot. to Suppress Hr'g Tr. ("Hr'g Tr."), ECF No. 89, at PageID

240; ECF No. 88-7.)  Detective Hutchison described his

involvement in the case in this way:

> I was assigned an auto parts robbery in 2007,
> February of 2007, and in investigating that robbery, I
> found robberies that started occurring in October of

2006 where the individuals that was committing these auto parts robberies wore the same type, FedEx uniform, he would enter the businesses squatting on the floor, started squatting throughout the whole robbery. The individual normally robbed these auto parts stores when it rained outside. He always had a silver revolver.

. . . .

. . . [A]s we got more business robberies in, the restaurants, McDonald's, Krystal's in particular, Wendy's, I looked at those, and I saw the same person that I saw on these auto parts stores, FedEx uniform, duck walking on the floors, on rainy days, silver revolver.

(Hr'g Tr., ECF No. 89, at PageID 241:5-21.)

Describing the manpower used to try to solve this group of robberies, Hutchison testified,

[W]e were working continuous doubles within the Safe Streets Task Force, full strength. We were recruiting officers from other precincts to work overtime, we were getting assistance from the investigator assigned to the MPD Robbery Bureau. We were working night and day trying to catch this individual. He kept us busy, very busy.

(Id. at PageID 241:24-242:4.)

Detective Hutchison's memorandum of the events of May 28, 29, and 30, introduced as Exhibit 7 at the suppression hearing (see id. at PageID 264), describes the events of May 28 as follows:

On this date at 1640hrs, the writer arrived on the scene of this business robbery, after hearing the radio broadcast of the hold up alarm at 1614hrs. A witness, later identified as store employee Prince Dillion, had reported the robbery in progress as he sat in his vehicle eating lunch. While enroute to the

scene, Investigators of SSTF [Safe Streets Task Force ("SSTF")], immediately put out known suspect information, over police radios, to assist w/the possible arrest of the robber and a heavy set mb [male black] "get away driver" operating a black 2002-2006 Chevy Impala SS, w/a rear spoiler and factory alloy wheels. This information had been recently reported, by witnesses (Edward Orange, Case #0805008529ME and Chris Swearengen, Case #0805008529ME), of past O'Really Auto Parts Robberies. Additionally, information was provided about the robber possibly wearing a Fed Ex uniform and armed w/a silver handgun, per victims, witnesses, and video surveillance from past auto parts robberies. A witness in a previous robbery (Case #0803013732ME) had reported that the robber took off his suit worn during the robbery and placed it in plastic bag during his flee. Investigations had revealed that the suspect would normally flee to the rear of the businesses after the robberies. Investigators' believed that this suspect was "possibly" the same suspect responsible for numerous auto parts and fast robberies in the city of Memphis, since 2006 which the writer has been tracking and has learned that the suspect would normally rob on rainy days. It had rained this day.

Two suspects had been detained for investigators. First, an m/b operating a 2004 black Chevy Impala SS, one street (Claybrook St. n/of of Poplar Ave.) behind the business. He was identified as John Scott, he was being detained on the nearby parking lot of "Cash America Pawn Shop." He and his vehicle fit the previous descriptions provided. Photographs of the vehicle are and submitted w/this case.

Second, an mb suspect, identified as Anthony Scott, had been detained after a short foot pursuit. An unknown passerby, on a bike, pointed him out and informed responding Uniform Officer T. Cox, that he'd seen this person, take off his clothing and was attempting to walk away from the area. Officer T. Cox attempted to speak w/the person pointed out, but he began to flee, and a short foot pursuit ensued, w/o visual sight of this person ever being lost by Officer T. Scott this person was detained w/o further incident at the intersection of Montgomery [Street] and Larkin [Avenue] (two (2) streets w/of the scene), by Uniform

Officer M. Giaccaglini #10017. He was then identified as Anothony Scott. See P/O [Patrol Officer] T. Cox's and P/O M. Giaccaglini's typed written statements submitted w/this case.

The clothing, worn by Anthony Scott, was then located beneath weeds/shrubbery in the yard of 208 N. Claybrook [Street], upon officers "back tracking" his route fled. A Fed Ex Jacket, blue wind pants, ski-mask, gloves, a fully loaded silver handgun (.38 revolver), and an O'Reilly's containing U.S. Currency was recovered. All found appeared to be the same clothing and weapon used during this robbery, per this robbery video observed by the writer, and previously described by the many past robbery victims/witnesses and also videos viewed by the writer. The recovered items were photographed in place, tagged as evidence, and submitted w/this case. The clothing will be submitted to T.B.I. [Tennessee Bureau of Investigation ("T.B.I.")], for processing/DNA comparison to Anthony Scott. See DNA/T.B.I. supplement.

Still photo evidence was also provided by the neighboring Memphis City School's "Pyramid Academy" (Larry Lipford, Building Engineer 901-230-8484), located at 1266 Poplar [Avenue] (Poplar [Avenue] and Claybrook [Street]) that captured Anthony Scott's flee on foot, after shedding his clothes worn during the robbery. The image disc is submitted w/this case.

At 1655hrs, both Anthony and John Scott were arrested and transported, by Uniform Patrol, to the Robbery Bureau located at 201 Poplar Ave, to later be interviewed by SSTF Investigators. TFO's [Task Force Officers] Sgt. T. Taylor and Det. Q. Smith coordinated the transports. See Supplements.

Still on the robbery scene, the writer observed two cash register drawers to be on the floor of the business. Photos were taken by crime scene. The writer spoke with all employee victims. Employee Donald Hoback said he'd just stepped outside of the business door to smoke a cigarette, when the suspect approached him from behind w/a handgun and said, "Get back in the store and open the safe!" Hoback said he told the suspect that the store manager wasn't present and only that manager could open the safe. He said as

the robber escorted him inside, the suspect ordered
the other two employees to come up front and get on
the floor. He said the suspect then told him again to
open the safe and registers and for him to get on the
floor. He said he again told the suspect that he
couldn't, so the suspect finally ordered him onto the
floor, and then ordered his coworker (Edrico Jones) to
open the registers. Hoback said the suspect took the
money from the registers and fled out of a rear door.
Hoback gave a typed statement. The writer then spoke
w/employee Edrico Jones. He said he was in the rear
of the business and was ordered up front, by the armed
suspect, that told him to open than safe and the
registers. He said he told the suspect he wasn't a
manager and couldn't open the safe, but did open the
registers and got onto the floor. He too gave a typed
statement. The writer spoke w/employee Cassandra
Bishop. She said she was in the business and also
ordered onto the floor by the suspect. She said she
heard the suspect telling her co-workers to open the
safe. She said the suspect told her to stay on the
floor, until she was sure he was gone. She too gave a
typed statement. Robbery Bureau Sgt. D.M. Moses was
on the scene speaking with the aforementioned employee
witness (Prince Dillon) that was in his car eating
lunch and notified the police. He too provided a
typed statement. The writer then spoke w/Mgr. Clark.
He said he wasn't present during the robbery and was
the only person that could open the safe. He said a
total of $673.59 was taken from the business. He
allowed the writer to view the business' video
recording of the robbery, which the writer observed
the suspect to be the same person that was responsible
for at least forty (40) other robberies that the
writer has been tracking, under then Master File
#0801011790ME. A copy of the video disc is submitted
w/this case.

At 1755hrs, the writer changed location to the
Robbery Bureau to coordinate the interviews. Upon
arrival the writer was told by Sgt. Taylor that
suspect Anthony Scott was presently secured in the
Homicide interview room, w/uniform officers present
outside of the door, to keep him totally separated
from suspect John Scott that was secured in Robbery
interview room "A". Sgt. Taylor said he'd checked on
the needs (food, water, restroom use) for both

suspects.  The writer requested Safe Street Task Force team members to begin taking victim/witness statements.  All victim/witnesses completed their statements and had left the Robbery office by 19:30hrs.  The witness statements taken included those of Uniform Officers T. Cox and M. Giaccaglini.

John Scott, Suspect #2

At 2010 hrs, the writer and SSTF Sgt. Wilson began to speak w/John Scott in interview room "A". He was offered water and provided a cup to drink.  He was eager to speak w/investigators and was verbally advised of Miranda Rights, which he said he understood.  He showed to have a criminal history that included Aggravated Robbery (4 years served), Felony Drugs, and Assault.  He said he was presently on Parole.  He initially said that he was in the area, using his wife's (Talesha Malone-Scott's) of 1mos vehicle (Chevy Impala) to take his cousin Anthony Scott to drop off some drugs, somewhere unknown to him, in the area of Poplar [Avenue] and Cleveland [Street] and was waiting on him to return, when he was arrested by the Police.  He said he's been told by the uniform officers that he had taken part in a robbery, but knows nothing about it.  He said he doesn't know what his cousin did once he exited the vehicle.  He said he can't recall what his cousin was wearing.  At 2100hrs, Investigators took a break in the interview. John Scott was escorted to the restroom by the writer and Sgt. Wilson.  At approximately 2200hrs, the writer received a call from Talesha Malone-Scott, the wife of John Scott.  She said she'd seen her husband being arrested on the news.  She requested to come and speak w/the writer and said she could be at the location within the hour.  Talesha Malone-Scott arrived at the robbery office at approximately 2255hrs.  She said she felt something was wrong, when her husband failed to pick her up from work.  She said they share the Chevy Impala that he was driving when arrested.  She said her husband is presently on Parole and has less that 90 days left.  She said that her husband doesn't work, but she is the family's financial supporter, which she works as a teacher at a Day Care.  She said she does however know her husband to "hustle" or sell drugs to make money, but knows he wouldn't be involved in any robbery.  When asked about Anthony Scott, whom hadn't

13

been shown on the news, she became irate. She asked if Anthony had been arrested as well. She said if there was robbery then Anthony is responsible and not her husband, because Anthony is crazy and robbery is his thing. She said she knew this, because she'd overheard Anthony telling John he had robbed some auto parts stores and was making money doing so. She said Anthony did give them money from time-to-time, to assist them w/bills, after he had done a robbery, but John wouldn't be involved. She said John must have been in the wrong place at the wrong time. She said she has over heard conversations, but doesn't know which auto parts stores Anthony has actually robbed. She said Anthony also works as a barber on Lamar [Avenue], and cuts John's hair regularly. She requested to speak w/her husband and said, "If you let me speak with him, I know he's gonna tell me the truth!" At 1105hrs, Talesha Malone-Scott was allowed to visit w/her husband John Scott inside of interview room "A" and in the presence of Sgt. Wilson. After an approximately fifteen minute visit, Talesha Malone-Scott exited the interview room, along w/Sgt. Wilson, and provided a typed written statement to SSTF Det. Gunn. She left the office, after the completion of her statement, at approximately 0030hrs. Prior to leaving she told the writer, "John is ready to tell ya'll the truth now!" At 0050hrs, and after Anthony Scott had been placed on a U.S. Marshall's hold in the Bartlett Jail, the writer and Sgt. Wilson restarted the interview w/John Scott. Upon entering the room, John Scott appeared to have been crying. He immediately said, "I want to thank ya'll for letting me see my wife. She told me to go ahead and tell ya'll the truth, so I'm ready to tell you what really happened." He was then provided a written copy of Miranda Rights, which he read aloud, said he understood, and waived by signature. He said, "Anthony did rob the business and I was suppose to drive the car and nothing else. Anthony was going to give me some money for my utility bill, but I don't know how much." He said there were no drugs involved and he's sorry that he lied. He said if requested, he would be willing to testify against Anthony, since he only drove during the robbery and did not actually commit it. Once being told of his physical description and vehicle description being consistent w/witness reports of two previous robberies, John

Scott denied being involved in any other robberies except this one, which he was caught. He said Anthony is the robber and not me! Anthony's thang to say is, "When it rains, I shine!" He said Anthony would say this, because he liked to rob auto parts stores on rainy days. He said he was told by Anthony to drop him at the intersection of Poplar [Avenue] and Cleveland [Street], after they circled the building & block a few times. He said Anthony got out the car wearing his usually "black or dark blue robbery suit and black tennis shoes" and carrying a silver looking revolver. When asked how he knew it was Anthony's "usual black or dark blue robbery suit and black tennis shoes," John got defensive and said, "I guessed Anthony would always wear the same clothes! I don't know why I said that! He said he was instructed to wait at the intersection to p/u Anthony, after the robbery. He said, after about five minutes, he saw Anthony coming back from the business and thru a nearby cut, so he pulled over and picked him up. He said they then saw several police cars, w/one of them turning around toward them, when Anthony suddenly said, "I got to get out of this car!" He said Anthony then leaped out of the car and took off running. He said the police then got behind him and he pulled over, when he was arrested. At 0120hrs, John Scott provided a typed written statement. The statement concluded at 0211hrs. He continually denied him or his wife's vehicle being involved in other robberies with Anthony. At 0230hrs, after a long wait to be processed at the jail, John Scott was transported to jail and assigned Booking #08117415. He was temporary placed on a 48hour Investigative Hold, pending contact w/Tony Arvin, AUSA [Assistant U.S. Attorney ("AUSA")] to be placed on a U.S. Marshall's Hold.

Anthony Scott, Suspect #1

It was decided that Anthony Scott was to be initially interviewed by Sgt. Taylor and Det. Smith. At 2005hrs, they began the interview in the homicide office. Sgt. Taylor and Det. Smith shortly reported back, that after advising Anthony Scott of his "Miranda Rights" concerning this case only, Scott refused to speak w/them and said he might speak at a later time. Both Sgt. Taylor and Det. Smith said Scott did not request an attorney. The signed Miranda

Advice form is included in this case. All communications with Anthony Scott regarding this case were discontinued. However, Sgt. Taylor informed the writer that Anthony Scott was expressing custodial concerns for his 18mos old daughter that he was suppose to have coordinated her pickup, prior to his arrest. Sgt. Taylor said Anthony Scott wanted someone to contact his girlfriend and inform her that the child needed to be picked up. The writer requested Sgt. Taylor to make the call (See Sgt. Taylor's supplement). At 2130hrs, the writer discussed w/supervisor Lt. Shemwell the possibility of having Anthony Scott placed on a U.S. Marshall's hold and possibly housed at another facility outside of the CJC [Criminal Justice Complex ("CJC")] and separate from John Scott. It had also been learned that both suspects are cousins' w/family members that work at the CJC. At 2155hrs, the writer checked on the well being of Anthony Scott. He was offered water and use of the restroom, which he refused both. The writer informed him that his transport to jail was being coordinated. Scott said he understood. After getting approval, the writer requested FBI Agent David Smith to coordinate a U.S. Marshall's hold and w/the City of Bartlett's Police Dept.'s jail. At 2200hrs, Agent David Smith reported back that he had coordinated the hold/temporary housing w/Bartlett. The writer completed the necessary paperwork and requested Det. Q. Smith to coordinate w/a Criminal Apprehension Team (CAT) officer, the transport of Anthony Scott to Bartlett. A copy of U.S. Marshall's hold ticket and Bartlett jail log-in sheet are included w/this case. At 1135hrs, Officer Gurley arrived at the robbery office w/the transport caged vehicle to transport Anthony Scott to Bartlett's jail. Det. Q. Smith was to assist. Det. Q. Smith, Sgt. T. Wilson, and the writer escorted Anthony Scott down to the waiting transport vehicle. Anthony Scott was cuffed at the wrists and shackled at the ankles. Upon arriving at the transport vehicle, Anthony Scott said, "Hey! It's a lot ain't it?" The writer responded yes, it sure is. Scott said, "I know it is! And I need to talk to ya'll, but I just can't right now. Give me till tomorrow, to get my head together, then I will be ready to talk to ya'll. Can't no lawyer or nobody help me now, just GOD!" The writer told Scott to get some rest and his head together and he'd be brought

back in for an interview the next day.  He was then secured in the transport vehicle and taken to Bartlett by CAT Officer Gurley and SSTF Det. Q. Smith.

On 5/29/08, at 1700hrs, the writer requested SSTF Det. Q. Smith to p/u and deliver Anthony Scott from the Bartlett jail, back to the Robbery Bureau at 201 Poplar for a follow up interview, which Anthony Scott had requested.  Det. Q. Smith delivered Anthony Scott to the Bureau at 1815hrs, and secured him in interview room "B".  The writer offered Anthony Scott water and use of the restroom.  He accepted one cup of water and asked for something to eat, because he said he hadn't eaten all night while at Bartlett.  He said he was up all night, in his cell, thinking that he knew he had to tell us the truth and the possible amount of time he could spend in jail for all that he'd done.  He said, "Ya'll not gonna have to yell or scream at me, or play any games with me, because I'm gonna tell you everything that I did, but I am hungry.  If it's not too much, I'd like to have some pizza and be able to hug my mother and little daughter one last time, before I go off to jail."  He said, "I've been locked up for robbery before and have been through this.  I know the difference between consecutive and concurrent, and would like to try and get this stuff ran together, so I could hopefully see my mother outside of the bars before God calls her home."  The writer told him that a pizza would be ordered for the investigators and he would be fed as well.  He said, "Meat Lover's is my favorite."  The writer told him that the possibly of seeing his mother and child could also possibly be arranged after his interview, but the writer could make him no promises or provide any favors for him speaking w/the Police.  Scott said he knows this and understands.  Anthony Scott took a deep breath and said, "I'm ready!  Let's do this!["]  The writer and Sgt. Wilson immediately provided him with a copy of his Miranda Rights, which he read aloud, said he understood, and waived by signature at 1900hrs. Without being asked any questions, Anthony Scott said, "I'm gonna tell ya'll now, if you got any robberies, starting in 2005 with somebody wearing a Fed Ex coat it's me!   I robbed from Whitehaven to Midtown. Midtown to East Memphis, East Memphis to Orange Mound, Orange Mound to Third Street, Third Street back to Raleigh!  All that's me!  I can't tell you how many,

but it's a lot and mainly all auto parts stores. I would only do the restaurants, when I didn't feel comfortable with the auto stores, cause I seen them tightening up their security. I was about to put my Fed Ex coat on EBay about two weeks ago, cause ya'll couldn't catch me!" Anthony Scott said it wasn't a complete Fed Ex uniform being used, but a Fed Ex coat only that his sister had left in her closet, after she transferred from Memphis Fed Ex, to Dallas Fed Ex. He said he saw it in the closest and thought it would be good to use. He said the pants are a blue mesh type material w/an elastic waistband, and his regular black high top "Reebok" tennis shoes. He said he used to wear a black mask w/the mouth open and would put a piece of white plastic in his mouth to hide his gold teeth, but later changed to the open face mask that covered his mouth, but allowed more of his face to breath. He said he and his brother (Marvin Carmichael, 6-23-78, deceased), went to jail for Robbery in 2002, and when they got out in 2005 they began to rob business' again. He said he can't remember the exact number they robbed together, but they made a "pact" to only rob together as a team, but he and his brother parted ways once he got into the barber shop business and his brother the drug selling business. He said his brother was also robbing dope boys and said, if he were to ever get caught, he wouldn't go back to jail and he'd rather the Police kill him first. He said his brother was killed by the Police in October 2007, after he robbed some dope boys in Hickory Hill and got into a shoot out w/the police. He said he wasn't there at the time, but spoke w/several people that were and his brother shot at the Police first and basically committed suicide by cop. Scott again said his brother committed several business robberies w/him prior to his death in 2007. He said on the videos where he's in the Fed Ex coat, that's his brother wearing the always the same gray sweater. The writer did recall seeing atleat three videos (Auto Zone, Advance, and Popeye's Chicken) of the Fed Ex Jacket and the person in the gray sweater. He said he then started robbing by himself, until he robbed the Krystal's on Mt. Moriah [Road] when one of the employees shot at him, so he got a guy known to him only as "Lil C", which he thinks Chris is his first name, to help him do some fast food robberies.

He said he could remember a couple of Krystal's and a McDonald's or two that he used "Lil C" on. He said "Lil C" is about 22yoa, light skinned, low bald fade, very short and skinny, walks pigeon toed, and has a tattoo on his upper left arm. He said he lives in the Emerald Point Apartments off Knight Arnold [Road], but he doesn't know the number. He said he recruited his cousin John to do ten (10) robberies with him, because he needed the money. He said, I promised him that everything would be split down the middle, but they only did four (4) and that John drove the black Impala and never went inside. He said he had to either call off the other six robberies, because he didn't like what he saw, or because he couldn't trust John to have the car where it was suppose to be, after he went inside and did the robbery. He said he would always go over his escape route prior to the robbery, and sometimes John would move the car and tell him that he had to, because he'd see the police go by or there was too much traffic in the area. He said he and John would go down the street arguing at each other. He said he believes he got caught this time, because John didn't have the car where it was suppose to be again, so it took him longer to get to the car and the Police were everywhere. He said, "Please don't charge John w/all this stuff. He doesn't know or hasn't done a fraction of the stuff I've done." He said, "I never would have hurt anybody! I've been shot at and never shot back! I know ya'll got my gun and it was fully loaded, but I never would have shot anybody! I always said, if the Police get me then they got me! I'm gonna go peacefully and not like my brother. That's what I did today. I ran, but when ya'll had me I didn't put up a fight or anything. I knew ya'll had me, so I just gave up." Anthony Scott then said, "Det. Hutchison I'm tired! I've been tired for a long time! I should have stopped this a long time ago, cause I wasn't raised like this! I knew better and I'm not proud of this! I'm embarrassing my mother and family!" Anthony Scott began to cry and said, "I only wanted to retire my mother early, because her health isn't the best." When asked what he used the stolen money for? He said bills. The writer asked if he had a drug, alcohol, or gambling problem and he said "No! I play the drums at my mother's Church every Sunday! I don't smoke cigarettes and wouldn't do any drugs! I

wouldn't put anything in my body that's gonna make me not be in control of me! I need to be in control of me at all times and I don't understand people that use drugs or alcohol!" He said he'd never gambled money a day in his life. He said he never got much money and believes the businesses exaggerated the amounts taken. He said the most money he ever got was probably when he and his brother robbed the Popeye's Chicken on Austin Peay [Highway], when they got over $3,000.00. He said he would get anywhere from $500-1,000 from the auto parts stores and preferred them, because of the guaranteed amount of money and less public traffic. The writer asked him about why he would squat, slide, or duck walk during some of the robberies? He said "Damn! You have been watching the videos haven't you? I would do that because I didn't want the outside traffic (people) to see me in there with a mask and gun robbing the place thru the big bay windows. I really only had to do that at night, because the stores would be so lit up and you could see inside." The writer asked why he mostly robbed during the rain or just after the rain. Anthony Scott said, "When I was locked up, I liked to play basketball. It would be so many people waiting to play, that sometimes I didn't get a chance on our short recreation break. I noticed whenever it rained, nobody would be on the basketball court during the break, so I would be on the court by myself, during the rain, and thought that people didn't like to do to much during the rain.

When I got out of jail, I would always walk the streets by myself, during the rain, and seen nobody else walking. I would see the cars going here and there, but wouldn't see them going to the auto parts stores. Who works on their car during the rain? So, I decided to use the rain to my advantage for less people being out or coming to the auto parts stores." The writer told Anthony that John has only confessed to participating in the robbery of the O'Reilly, which he was caught. Anthony said Johns wasn't telling the truth. He said John participated in at least three others and was the driver. He said, if given the opportunity, he'd speak w/John and tell him to tell the truth.

At 1925hrs, the writer began to take the typed statement of Anthony Scott. Receptionist Penny Brown

#2942, was requested to type the statements. The Master File Case #0805016286 (O'Relly Auto Parts, 275 N. Cleveland [Street]) was again not discussed w/Anthony Scott, after he'd said he didn't want to speak w/the Police concerning that robbery and indicated on his first of two Advice of Rights forms. However, there is a video recording of this robbery and Anthony Scott wearing his Fed EX uniform, armed w/a silver revolver, and consistent w/all other videos.

Anthony Scott gave a typed confession to robbing the O'Reilly Auto Parts located [at] 4110 S. Third [Street] on 5-15-08 (Case #0805008730). . . .

(ECF No. 88-7 at PageID 2001-08.)

On My 29, 2008, after signing an Advice of Rights form and waiving his rights (see ECF No. 88-4), Scott made five individual statements (see ECF No. 88-5) admitting to five separate business robberies. Each of these statements also contained a Miranda warning and waiver at the beginning of each statement. (Id.)

On May 30, Scott signed another Advice of Rights form waiving his rights (see ECF No. 88-9), and signed statements admitting to six more business robberies (see ECF No. 88-10).

In addition to the memorandum prepared by Hutchison (ECF No. 88-7), the following testimony was received at the suppression hearing.

## A. Sergeant James Taylor

On November 23, 2009, Sergeant James Taylor ("Taylor") testified as follows.

21

We had a series of auto parts store robberies in the Memphis area, and the individual that was doing all the robberies was completely masked up from head to toe. He was wearing a FedEx jacket, and we were calling him the ["]squatter robber["] because all the videos that we watched from the video stores showed him never getting any higher than the countertop. Once he went in the business, he would duck down behind the counter where the clerks work and would mainly duck walk during the whole series of the robberies because if a uniform car or ourselves drove by the business you wouldn't be able to tell anything was going on because he was always down behind the counter, and we had probably 30 to 40 robberies that had occurred over a 14, 15-month span that we were investigating.

(Hr'g Tr., ECF No. 89, at PageID 210:10-23.)

Taylor then testified about the events of May 28, 2008.

Q:   . . . [D]id you receive a call on May 28th, 2008 at about 4:10 p.m. about a robbery in progress at the O'Reilly's Auto Parts store located at 275 North Cleveland [Street] here in Memphis?

A:   Yes, sir, I did.  Myself and the FBI task force, we were in our office, and we actually heard the call go out, and we immediately knew that the person doing the robbery was the person we were looking for for the other ones.

. . . .

[T]hat month, May of '08, we had been working around the clock basically on that series of robberies, we knew it had to be our guy.

(Id. at PageID 211:8-22.)

[W]e could hear radio traffic of them taking people into custody.  There were two individuals that were arrested, one was in a car which we knew to be the getaway car and the other one was on foot, which was Mr. Anthony Scott.  And when I got there on the scene, the officers had him in the back of a squad car with his Tennessee ID sitting on the hood of the squad car.

(Id. at PageID 212:12-18.)

Taylor testified about the events following Scott's arrest.

> Once we got to the Robbery Office, Mr. Scott was placed into a secure interview room because we had witnesses coming down from O'Reilly and we did not want to — if the investigator would show a photo spread, we do not want the victim to see the defendant in any shape, form or fashion, so we put them in a different room outside the view of the witnesses that were coming down.
>
> . . . .
>
> Yes, sir. Due to the fact, I was the first one to make the scene of the arrest, Detective Hutchison assigned me and Detective Smith to interview Mr. Scott regarding the O'Reilly's robbery that had just happened.

(Id. at PageID 213:14-20, 213:23-214:1.)

At approximately 5:15, the detectives arrived to interview Defendant. Their initial questions were simply "biographical." Taylor testified that he talked to suspects "about their personal stuff, nothing to do with the crime." (Id. at PageID 214:15-20.) After the initial contact with Defendant, Taylor then left to speak with certain robbery victims while Defendant was "still secured in the interview room." (Id. at PageID 215:7-22.) Taylor testified that no one spoke to Defendant during this time, "he was just there on his own." (Id. at PageID 215:23-24.)

At approximately 8:10 p.m., Taylor and Smith returned to the interview room to speak with Scott again. (Id. at PageID 216:5-8.) Taylor testified,

> My procedure basically on interviewing an individual, we have a series of questions that we ask, it is basically can you read and write, which he answered yes. We asked him what was the last grade he completed in school, if he's under the influence of drugs or alcohol, if he knows he's being interviewed by law enforcement, if he has any mental problems or if he has any medical problems that would prevent him from participating in the interview, all of which he answered correctly, he wasn't under the influence of alcohol or drugs at the time, he didn't have any mental problems, he didn't have any health problems, he understood who we were, and basically my policy is to read the Miranda Form. Some detectives will hand it to a person and let them read it out loud. I read it for them, and then after I read it out loud, I will give them the form and let them look over the form.
>
> . . . .
>
> I basically asked . . . Mr. Scott if he understood his right, and he said yes, he did. So I told him to put ["]yes["] and his initials by the part that said[,] ["D]o you understand your rights.["] The second part of the form, it says: ["]With your rights in mind, do you want to speak with us now[?"] and Mr. Scott wrote[, "No,"] and put his initials. And I asked him basically what does that mean, and he says[, "]I will talk to you later, but I do not want to talk right now at this time.["]
>
> . . . .
>
> He did not want a lawyer, he just wanted some time. He basically told me he wanted some time to talk to his girlfriend and make some arrangements for his 19-month old daughter, but that he would talk to us later.

Q: But he said he didn't want to talk to you about the O'Reilly's May 28th robbery, that he would talk to you later?

A: Yes.

Q: You recorded that as a ["No"] on the form?

A: Yes, sir.

(Id. at PageID 216:10-217:25.)

After Scott signed the Advice of Rights form, telling Taylor he did not wish to speak with them "right now," but would "talk to [them] later," Taylor bought Scott a soft drink and left him in the interview room. (Id. at PageID 219:5-10.) Taylor stated, "Whenever we have somebody who is being detained or under arrest, we make sure that they're provided, you know, bathroom breaks and meals or whatnot. I believe that during the course of the investigation, we will normally buy food for them if they request it." (Id. at PageID 220:25-221:4.)

Taylor also testified that during the interview, Scott expressed some concern that his daughter needed a ride home. (Id. at PageID 220.) Specifically, Taylor testified,

Q: What appeared to be his main concern at the time you were talking to him, Mr. Anthony Scott?

A: His girlfriend and his daughter.

Q: Was he concerned about picking his daughter up from school or something like that?

A: Yes, sir, he wanted to make sure that they had a way to get home, that arrangements were made for them.

25

(Id. at PageID 220:9-15.)

Taylor stated, "I believe I tried to call his girlfriend, I can't remember if I got in touch with them or not." (Id. at PageID 220:18-19.) Taylor maintained that Scott never asked for a lawyer during the interview. (Id. at PageID 222:5-7.)

On cross-examination, Taylor again recounted the events of May 28, 2008, and the robbery of the O'Reilly's on North Cleveland Street. Taylor stated that Scott was apprehended "around 4:27 [p.m.]" (Id. at PageID 223:22.) Taylor arrived on the scene at "[a]bout 4:35." (Id. at PageID 223:18.) According to Taylor, "people started talking on the radios, they had found the clothing, the money that was dumped and everything from the location." (Id. at PageID 223:23-25.) Taylor did not talk to Scott at the scene, but made the following observations:

> Q: And how did he seem to you at that point, were you able to observe him?
>
> A: He seemed a little deflated, I mean he wasn't happy about the situation that he was in. He just got arrested for a business robbery, but he was a little — he wasn't enthusiastic about it, I don't know the word I'm trying to use, but he was just kind of deflated.
>
> . . . .
>
> I didn't even speak to him at the scene, but the officers had to chase him on foot. Somebody you have to chase, I don't want to open the car until we get to a secure environment, so I didn't even talk to him there.

(Id. at PageID 224:6-12, 17-20.)

Taylor also described the interview room at 201 Poplar in which Scott was placed: "It's basically just a six-by-eight, I mean it's a small room, maybe eight-by-ten. It has got a metal bench with a handcuff, a wooden table and a window you can look in and out of through the lieutenant's office." (Id. at PageID 225:13-16.) He stated that Scott's leg was shackled to the table, but that his hands were free.[3] (Id. at PageID 225:22-226:18.)

Taylor testified that the only robbery he asked Scott about was the May 28 robbery of the O'Reilly Auto Parts store on North Cleveland Street. (Id. at PageID 234:10-11.)

Taylor testified that at approximately 11:00 p.m. Scott was taken to the Bartlett Jail because the MPD did not want Anthony Scott and "Mr. John Scott in the same jail." (Id. at PageID 220, 235:19-20.) Taylor stated that the MPD prefers to separate suspects and it took some time to get permission from the Bartlett personnel to place Scott there. (Id. at PageID 235:20-24.)

### B.    Detective Eric Hutchison

The Government's second witness was Detective Eric Hutchison ("Hutchison"), a thirteen-year veteran of the MPD. (Id. at PageID 240:7-14.) Hutchison was the "case agent in

---

[3]    Suspects are typically secured to the bench in the interview room because unsecured suspects have, in the past, climbed through the room's ceiling. (Id. at PageID 226:7-10.)

charge" of the "squatter robberies" investigation team. (Id. at PageID 240:23-241:1.) During the investigation, Hutchison created a photographic collage illustrating how the suspect would rob the various stores. (Id. at PageID 242:5-12; see also ECF No. 88-3) Hutchison testified, "I created that, I called it a pyramid, it is a photo collage of the individual in action. In each of those, he's squatting, duck walking, crawling across the floor with that silver revolver and that same FedEx type coat and uniform gear, same black tennis shoes." (Id. at PageID 242:8-12.)

Hutchison testified that he had video of the same squatting suspect from forty-two robberies. (Id. at PageID 242:22-23.)

On May 28, 2008, Hutchison received a call regarding the O'Reilly Auto Parts robbery. (Id. at PageID 243:8-12.) Hutchison testified that is was raining that day, and "[w]henever it was raining, we were on standby." (Id. at PageID 243:21-22.) Hutchison testified,

> Well, I proceeded directly to the O'Reilly's store. While en route, we were fortunate to have the West Precinct or Union Station precinct officers respond rather quickly. We had been giving out broadcast information for months on what to look for as far as this individual, the type of clothing, but we finally got a break in this case, the last four robberies that he did where we got information about a black vehicle with a spoiler on the back being driven by a heavy set male black. Four auto parts robberies, all O'Reilly's were robbed back-to-back, and individuals that stayed on streets behind those businesses pointed out to us that the individual that

robbed the store had a getaway driver that was driving
this vehicle.  So with that information being put out
over the radio by myself and by Sergeant Taylor who
just left while we're trying to get to the location,
the uniform officers apprehended the getaway driver
first, the same black car.

Q:   Who was that?

A:   John Scott.

. . . .

    Apprehended him first.  I got on the radio and
said he's going to run to the back, he's going to have
a FedEx uniform.  Officers were listening, saw an
individual run to a location, shed his clothing and
got in foot pursuit behind him and took the person
into custody, and he was identified as Anthony Scott.

(Id. at PageID 244:1-25.)

Hutchison testified that a ski mask, gloves, a FedEx

jacket, a .38 caliber revolver, proceeds from the robbery in

United States currency, and an O'Reilly Auto Parts bag were all

recovered on the ground in the area.  (Id. at PageID 245:1-4.)

Hutchison continued,

    I arrived – I went directly to the auto parts
store.  Over the radio, I coordinated different
investigators to do different things.  Sergeant Taylor
was to go to the location where Scott was arrested to
check on his status and to get information from the
arresting officers to put it in case notes and stand
by for further instruction.  Officer Beasley went to
the location where the clothes were to stand by
regarding the photographs and for Crime Scene
collection.  Different investigators had different
assignments.  Sergeant Wilson and other investigators
go to the location of John Scott.  I went directly to
the scene and investigated the scene itself.  I spoke
directly with the victims, the employees at the
O'Reilly's, and I spoke with the business manager.  I

stood by where he counted down to see how much money was taken from the business.  I looked at the surveillance video of that robbery.  I knew this case like the back of my hand, it was the same person that I had been looking at for months that did this robbery.

. . . .

I had the scene processed, I called our crime scene investigative unit out, they photographed the scene and they dusted for prints, and they collected the video for me, and they photographed the business itself.  I spoke with each individual business employee and got a brief scene verbal statement from them and coordinated an investigator to take each one of those victims to the Robbery Office for an official typed statement.

. . . .

[Anthony Scott] was taken into custody shortly after 1600, closer to 1630.  Myself, being as busy as I was, I didn't leave the scene until later that evening.  I had already coordinated or instructed Sergeant Taylor and the uniform officers to take him to robbery.  I didn't come into contact with Mr. Scott unil approximately 2100 that night.

. . . .

Close to that, after I was told by Sergeant Taylor that he didn't want to talk to us at that time, he might want to talk later on.  I will leave it at that, 2100, I'm sorry.

. . . .

After we interviewed all the victims and witnesses, got their official statements, we had a team meeting.  I called a team meeting on who was going to do what next.  At approximately 8:00 o'clock, I instructed Sergeant Taylor and Detective Smith to go ahead and advise Mr. Scott of his rights and begin speaking with him.  Shortly after that, Sergeant Taylor came to me and told me that Anthony Scott said he did not want to speak to the police right now, but

he would probably speak with us later on.  Sergeant
Taylor told me he had a lot on his mind, but his main
concern was, he was constantly asking for someone to
check on the well-being of his daughter, and he needed
some — he needed someone to contact his family to pick
up his daughter.  I instructed Sergeant Taylor to take
care of that.

. . . .

     At the time, I spoke with the Safe Streets
supervisor and told him my desire or requested my
desire to have Anthony and his cousin John separated
and not housed together at 201 Poplar.  I had already
interviewed John, started interviewing John, he told
me they also had additional family members at 201
Poplar.  I asked my supervisor could we coordinate
Anthony Scott being housed at the Bartlett Jail and
also having a U.S. Marshal's Office hold placed on
him.  I spoke with the FBI supervisor at that time
with Safe Streets, Agent David Smith, which he had to
contact someone else, an AUSA in order to make that
happen.  It took a little time.  I went in, I checked
on Mr. Scott's well-being personally.  I asked him did
he need anything.  He said he was okay.  Anything like
restroom or water or anything, and I came back out of
the room.  No, before that, I told him to stand by,
his transportation was being coordinated, those were
my words to him.  We got approval from an AUSA and
from Bartlett, director of their jail services, to go
ahead and have Mr. Scott transported there.  I had to
coordinate – or I had Smith coordinate with one of our
criminal apprehension team officers to transport Mr.
Scott because we have a policy, we cannot transport a
prisoner unless they're in a caged vehicle.  They have
unmarked caged vehicles, and so at approximately
11:10, 11:15, the caged vehicle investigator showed
up, I shackled Mr. Scott at the wrists, I shackled his
ankles; and myself, Sergeant Wilson and Detective
Smith escorted Mr. Scott down to the transport
vehicle.

. . . .

[A]s we were about to put him in the back of the
vehicle, Anthony Scott looked at me and said[, "I]t's
a lot, isn't it?["]  And I said[, "Y]es, it is.["]  He

said[, "H]ey, look, I know I need to talk to y'all, I
just can't do it right now, let me get my head
together, let me get my head together, and I will talk
to y'all later.["]  He said[, "]I'm tired, let me get
some rest, I will talk to you later.  I know I have
got to talk to you.["]  My words to Mr. Scott was[,
"G]o ahead, get you some rest, I will have you brought
back tomorrow, and if you choose to talk to us at that
time, then we'll talk.["]  And he was put in the back
of the vehicle, no one conversated with Mr. Scott, and
he was transported off to the Bartlett Jail.

. . . .

On the next day [May 29, 2008,] at approximately
1700 — let me see, let me doublecheck my notes.  I'm
sorry 1800 — no, 1700, I requested Detective Smith of
the Safe Streets Unit to get in touch with the cage
vehicle and go to the Bartlett Jail and request a
detective's visit with Anthony Scott and have him
brought back to 201 Poplar to see if he wanted to
speak with us at this time.  Detective Smith carried
out the assignment, and at 1815 hours, Anthony Scott
arrived at 201, and he was secured in Interview Room B
of the Robbery Bureau.  He was shackled, left ankle
only.

(Id. at PageID 245:7-250:16.)

Hutchison testified that he and Wilson initiated an

interview with Defendant at approximately 7:00 p.m.  (Id. at

PageID 250:21-22.)

Before we could ask him any questions, Mr. Scott said,
["L]ook, I've been through this before, I know the
difference between consecutive and concurrent, and I'm
going to try and get all this stuff pushed together,
okay.["]  He said[, "I]t's not — it's not going to be
a situation where you have to yell and scream at me or
anything,["] he took a deep breath and he said[,
"L]et's go.["]  We stopped Mr. Scott, I provided him a
typed copy of his Miranda Rights, Advice and Miranda.
Mr. Scott told me he could read and write, he admitted
to the 12th grade at Melrose High School.  I showed
him — show me you know how to read, I took my pencil —

32

on the Advice of Rights form on the first paragraph, I noted I said[, "R]ead this out loud for me.["] Mr. Scott, he read it out loud. I told him at that point[, "Y]ou read the question and then your answer, read the first Q.["] He said it, I asked him did he understand it, and he said yes, and he indicated by writing yes on there and putting his signature beside it. I asked him to read the next Q. He read it, which says he agreed to speak with us, which he signed yes and put his initial beside it. The following line was a signature line. I asked him to write his complete signature, which he did so. Upon finishing that, I witnessed the form, Sergeant Wilson witnessed the form, I didn't have to ask Mr. Scott a question. Mr. Scott said[, "L]ook, if you got somebody robbing in the FedEx uniform from["] – I don't want to misquote him, I want to check this right here, because I didn't have to ask him any questions. Excuse me, one second.

. . . .

    His words were — he took a deep breath, he said[, "]I'm going to tell you if you got anybody — I'm going to tell y'all now, if you got any robberies starting in 2005 with somebody wearing a FedEx coat, it's me, I robbed from Whitehaven to Midtown, Midtown to east Memphis, east Memphis to Orange Mound, Orange Mound to Third Street, and Third Street back to Raleigh, that's all me.["]

(Id. at PageID 251:1-252:10.)

Hutchison testified that although Scott began confessing to multiple robberies, he never discussed the May 28, 2008, O'Reilly Auto Parts robbery. (Id. at PageID 256:20-257:6.) Because Taylor informed Hutchison that Scott stated he did not want to speak after he was arrested on May 28, Hutchison "made the decision not to visit that case again, period. . . . We only discussed the other 41." (Id. at PageID 257:3-6.)

Hutchison also testified that Scott asked to see his mother and daughter at the same time he requested food. (Id. at PageID 275:4-7.) Hutchison testified,

> I told him I couldn't give him any special privileges, I couldn't do him any favors or anything like that, sir. I told him once we got done with everything, we'll see if it is possible if that can happen or not, but I can't do that as a favor to him, let him see his mother or daughter or anything like that.

(Id. at PageID 275:7-12)

Hutchison also testified that throughout all his contact with Scott from May 28 to May 30, 2008, Scott never asked for a lawyer. (Id. at PageID 265:5-12.)

### C.    Detective Brian Beasley

The Government's final witness was Detective Brian Beasley ("Beasley"). Beasley was a member of the Safe Streets Task Force assigned to the "squatter robber" case, but Beasley had no contact with Scott until May 30, 2008. (Id. at PageID 295-96.) Beasley testified that at no time during his interview with Scott on May 30, 2008, did Scott ask for a lawyer. (Id. at PageID 300:16-18.)

### D.    Defendant Anthony Scott

Scott testified on the second day of the hearing, November 24, 2009. (See Hr'g Tr., ECF No. 90, at PageID 330.) Scott recounted his first interview with Taylor.

> My first time speaking with Taylor, he spoke with me after maybe three or four other people, then he

came in, and it was sure with him, he just introduced
himself, it was him and another fellow, he said who he
was, FBI or something like that, but basically what he
was telling me is that — asked me did I want a lawyer
— you know, he said, ["F]irst of all, I'm not here to
holler at you or anything like that, basically what I
am here to do is if you would like a lawyer and if you
would like to say anything.["]  And when he asked me
did I want a lawyer, I told him yes.  He asked me[,
"W]ould you like to say anything,["] I said[, "N]o,
sir.["]   And basically that conversation was over.
Like I said to him, it was very short, very, very
short conversation.

(Id. at PageID 331:5-17.)

Regarding the "three or four other people" that spoke with

Scott before Taylor, Scott testified that he recalled an Officer

named "Tim."[4]  (Id. at PageID 332:11-13.)  Scott testified:

        And basically, him in particular, he was really,
you know, like aggressive like, you know, he was — you
know, just — he was the only one that was really just
speaking aggressive to me like[, "Y]ou, you, you going
to tell us something you did, your dumb A-S-S cousin
over there playing dumb like he don't know what's
going on, we're going to kick his A-S-S,["] and[,
"Y]ou did it,["] and[, "Y]ou would have been better
off killing somebody and getting less time than all
this robbery right here,["] you know.  And I was like,
["S]ir, I have no idea what you're talking about.["]
Oh, you — like I say, he was really just aggressive,
and it was like maybe two more people that came in
and, you know, was asking me questions or did I want
to say anything, but they wasn't aggressive or
anything like that, they was just, you know, asking
me.  And like I told them, I haven't done anything, so
what could I tell you.  And hours passed by, hours
passed by, and then that was my first time when I seen
Detective Hutchison, like I said, it was hours later.
I only seen him for that quick.  Only thing he did was

---

[4] There is no corroborative evidence from the suppression hearing that
"Officer Tim" either actually existed, or, if he was present on May 28, 2008,
did any of the acts attributed to him by Scott.  Later, no "Officer Tim"
testified at Scott's trial.  (See Trial Ex. & Witness List, ECF No. 134.)

open the door, looked in at me and said[, "]I'm
Detective Hutchison, I will be over your case.["]    I
was just introduced, and closed the door and I didn't
see him until some more hours.  That's what happened.

(Id. at PageID 332:15-333:11.)

Scott testified regarding his interview with Taylor:

    He asked me did I want a lawyer, I said yes, and
he said[, "W]ould you like to make any statements or
anything like that.["]  I said[, "N]o, sir.["]  And he
asked me, you know, to sign the paper saying that I
didn't want to make a statement and that I wanted a
lawyer.

.  .  .  .

    I was asking him, you know, could I please use
the telephone to call and check on my daughter because
I supposed to pick her up, you know.  I have custody
of my daughter, she live with me every day all day,
you know, and like I say, I was supposed to pick her
up and I was concerned about her getting picked up and
making sure that she was safe, you know, so I was
asking could I please use the phone to call somebody
so they could at least pick my daughter up or, you
know, so my family, so they could, you know, have
transportation or see what is going on with my
daughter.

Q:  Okay.  What else did you talk about?

A:  Besides that, basically, could I read or write or
what school did I go to, did I graduate, just a few
questions, you know, but basically I was asking him,
more concerned about my daughter, you know, her being,
you know, safe and getting picked up and making sure
she was okay.

(Id. at PageID 333:22-334:21.)

Scott testified regarding his interview with

Hutchison:

After I talked to Taylor, I believe Timothy or Mr. Tim, Tim, he came back in maybe another time, the time after that, you know, same procedure, trying to ask me, you know, ask me or trying to — really from my understanding, him trying to intimidate me, but, basically, after that, I don't recall speaking with any other people or anybody else. Except for later, later on, later on, later, then I seen Detective Hutchison.

. . . .

Basically, when I saw Detective Hutchison, that's when hours later he asked me, you know, would you like to say anything. He was, you know, polite, he was like[, "W]ould you like to say anything, make any statements.["]  I was like[, "N]o, sir.["]  I asked him too, sir, could I please, you know, could I use the phone, call and check on my daughter and make sure she is all right. He said, ["W]ell, we're not going to do that,["] and he was persistent on do you want to say anything or make any — I was like[, "N]o, sir.["] And then he said, ["W]ell, this is what we're going to do. We're going to take you to another jail until you ready to say something, and we will come back and get you tomorrow and see if you ready then.["]

(Id. at PageID 334:25-335:20.)

After the interview with Hutchison, Scott testified

regarding the transport to Bartlett Jail and the events of May

29, 2009.

I believe I arrived at the jail maybe at 1:00, and, you know, process and all that, whatever, and they left. And basically, the next time I heard or seen from them was I believe it was almost 6:00 o'clock, I asked the officer there what time it was. I seen them through the window pulling up, so then I asked the officer what time was I leaving, it was almost 6:00, so he took maybe 15 minutes or whatever or so to finally come in and get me and we got out to the vehicle. You know, immediately, once I got in the vehicle with them, I said, ["M]an, I'm sure glad to see you guys, man,["] I said because I haven't ate

anything, I said[, "A]re they going to feed me[?"]  I
said, ["M]an, it's past lunchtime, it is almost 6:00,
7:00 o'clock, man.["]  He said, ["T]hat's okay, we're
going to — we will make sure you get something to
eat.["]  I was like, okay, so we took the trip back to
201, and once we arrived at 201, they placed me in an
interview room, and he asked me what would you like to
eat?  I said, man, it doesn't matter, anything, man,
just, you know, I'm hungry, get me something to eat,
and he was like[, "W]hat would like, pizza,
Wendy's?["]  I said it doesn't matter, your choice.
He said[, "W]ould pizza be fine for you[?"]  I said[,
"Y]es, sir.["]  So — oh, yes, excuse me, I failed to
mention, before he asked, you know, asked me what was
my choice of what I wanted to eat, you know, when I
got there, he was like – I said, you know, I would
like something to eat, I haven't ate, I'm hungry.
This was his words out of his mouth, he said[, "W]e're
going to take care of you, trust me, we're going to
take care of you, you know, but you got to give us
something.  We give you something, you give us
something,["] that's what he said out of his mouth.
And I was like, well, okay, and then he said what
would you like to eat, I said it doesn't matter, man,
just get me something, you know, to eat.  And he
said[, "D]o you like pizza?["]  I said[, "Y]es,
sir.["]  I said that would be fine.  I said[, "Y]es,
sir.["]

. . . .

After we got the situation — he said with the pizza,
we have ordered the pizza, it will be here, whatever,
and again, I asked him, I said, you know, could I
please use the phone to contact my daughter to check
on her and see if she is safe.  I said, you know, it
has been a whole day, and I don't know what's going on
with her, I said I haven't spoke with my family, you
know, I'm sure they're concerned and worried, you
know, and I don't know what is going on, at least let
me call somebody and speak to somebody, and then
again, Detective Hutchison said, ["Y]ou give us
something, we give you something.["]

. . . .

So basically, you know, right after that, I told
them, I said, man, what do you want me to — what do
you want me to do.  I said, you know, I can't tell you
nothing.  He said, well, like basically say that you
are — you know, say that you robbed, that you did
these robberies, and that's when I did tell him, you
know, I said my mother didn't raise me, you know, in
that my mother didn't raise me like that.  I don't
mean to skip back, you know, but the majority of the
things that he said, he took part of what I said and
just added in.  I don't know what — he just created
something and went somewhere else with it with just
one or two words that I said.  Yes, I did tell him
that I wanted to retire my mother.  What I said, I
said, ["S]ir, my mother didn't raise me like that, you
know.["]  I said I was working two jobs and I had a
little career going, I said I was trying to retire my
mother, you know what I'm saying?  Now, how he got
that and said that I was going to retire my mother
from robbing, I don't know where in the world that —
like I say, he took one or two words what I saying and
just created.  I don't know what he did, but — so I
told him my mother didn't raise me like that, and he
was basically saying, like, well, you going to have to
tell us something, something.  I was like, well, what
do you want, and he said just say you robbed these
stores, you robbed the store.  So we got into doing
the statements or whatever, and, you know, pretty much
at this time, I'm thinking to myself I'm just going to
go ahead and do what he ask me to do so I can at least
use the phone and check on my daughter and let my
family know that I'm okay.  So I just got to telling
them, I said, well, yeah, I robbed, I went in and got
the money and, you know, and left.

. . . .

I started with the statements, and basically they just
said that you robbed these places, so I started off
with ["]I went in and I asked for the money and I
left.["]  He was like[, "N]o, you are going to have —
you are going to have to add more than that, say that
you took money out of the cash register and the safe
and["] - you know, so I was going — I went along with
what he was saying, yes, I took money out of the safe,
out of the cash register, and he was like[, "W]hat was
you — what did you have on, what was you wearing?["]

39

I said some jeans, you know. He said[, "S]ay that you
had on a FedEx coat, black pants, things of that
nature,["] and basically after that, you know, there
was maybe — the first statement, then we moved on to
another statement or something else, and you know, at
this time, I'm — you know, I'm just making up stuff,
you know, saying something trying to give this
statement so I could use the phone, and like I was
just making up names and saying stuff, and he was like
— he stopped me, he said, this — is his words, he
said, ["N]o, say just like what you said in the
statement before this, I like to make sure that all of
my statements be at least three pages.["]   These are
the words that came out of Detective Hutchison's
mouth.   He stopped me, he said[, "S]ay what you said
in the last statement, just like you said this, you
did this, you did that, I like to make sure all of my
statements are at least three pages.["]

(Id. at PageID 336:2-340:21.)

Scott testified that he was then taken back to the Bartlett

Jail, without getting the opportunity to use the phone and call

his family.  (Id. at PageID 341-42.)

The next day, May 30, after being brought back to 201

Poplar, Scott signed more rights waivers and more confessions.

(Id. at PageID 343-44.)  Scott testified that after he signed a

number of statements confessing to various robberies, his family

was brought in.  (Id. at PageID 344:22-25.)  Scott testified

that he "wanted to let them know that everything is okay, I'm

all right, don't worry, that, yes, they made me sign a couple of

papers, but don't worry everything is okay.  And basically I was

telling her that, you know, I need a lawyer, you know, I need a

lawyer."  (Id. at PageID 344:25-345:4.)

On cross-examination, Scott denied that he had robbed the
O'Reilly Auto Parts store on North Cleveland Street on May 28.
(Id. at PageID 346:19-20.)  Defense counsel objected to the
question as beyond the scope of direct examination, but the
Court overruled the objection, finding that the question went to
the issue of voluntariness and was relevant to show Scott had a
motive to "tell his side of the story."  (Id. at 346:21-347:7.)
Scott also denied fleeing from police after the robbery and that
he was chased at the time he was arrested.  He stated, "It
wasn't so much that I fled from the police, I crossed the
street, and I was jogging, and before I know it, the police was
behind me."  (Id. at PageID 347:15-17.)  He stated that while he
lived in Orange Mound, an area that was "a long way from
Cleveland [Street]," he was in the Cleveland Street area because
he had come to cut his cousin's hair and while there he received
a phone call regarding "going to get some drugs."  (Id. at
PageID 347:20-348:13)  Scott also denied discarding his pistol
and FedEx jacket after the robbery.  (Id. at PageID 348:14-17)
Scott did not deny that his signature appeared on the multiple
Advice of Rights forms and statements.  (Id. at PageID 349:16-
24.)

## III. RULINGS ON THE PARTIES' PROPOSED FINDINGS OF FACT

### A. Defendant's Proposed Findings of Fact

Defendant submits twenty-three proposed findings of fact. (ECF No. 177 at 1-6.)  As an initial matter, the Court recognizes that a reviewing court "is 'not restricted to considering evidence offered during the hearing on the motion to suppress.'"  United States v. Perkins, 994 F.2d 1184, 1188 (6th Cir. 1993) (quoting United States v. McKinney, 379 F. 2d 259, 264 (6th Cir. 1967)).  This is especially true in circumstances "when evidence presented only at trial casts doubt on what would otherwise be a correct pre-trial denial of a suppression motion."  United States v. Hicks, 978 F.2d 722, 725 (D.C. Cir. 1992); see also United States v. Anthony, 39 F. App'x 91, 96 (6th Cir. 2002) (noting that where evidence "emerges at trial [that] supposedly casts doubt on the district court's initial suppression ruling, the defendant must renew his motion to suppress on that basis, in order to secure a ruling by the district court").  In the instant case, Scott renewed his motion to suppress during trial in light of "the evidence that has come out in the direct testimony and cross examination during the trial."  (ECF No. 164 at PageID 1774:11-13.)  In response, the Court stated:

> Everything in the record supports the conclusion that it was — these statements were each intelligently made, there's no problem with Miranda rights at all,

42

and that, frankly, Mr. Scott, according to the record, was a full participant in each of these statements. I'm not sure if there's anything else we need to go over. What does the government think in that regard?

MR. ARVIN [Prosecuting Attorney]: Your Honor, I submit there has been no change in the record from the suppression hearing.

THE COURT: It might have changed some —

MR. ARVIN: Actually more extensive. The statements were properly given pursuant to Miranda warnings and that they were wholly voluntary, which were the issues at the suppression hearing.

THE COURT: Right. I think that it is correct that the record is more extensive now and that, frankly, bolsters the record as previously submitted and the opinion as previously prepared in the case, so the court adopts the opinion previously prepared.

(Id. at PageID 1774:14-1775:8.)

Where the record was not expanded by subsequent trial testimony, the Court finds that the appropriate evidence to reference is that from the original suppression hearing and any documentary evidence prepared close in time to Scott's arrest and interrogation.

Defendant's proposed findings of fact are as follows.

**Proposed Fact 1:**

1. On May 28, 2008, at approximately 4:30 p.m., Mr. Scott was arrested for allegedly robbing an O-Reilly Auto Parts store located at 275 N. Cleveland Street, Memphis, Tennessee. (Suppression Hr'g Tr. I ("SHT I"), R. 89, at Page ID # 212; Trial Tr., Mar. 26, 2010 ("Trial Tr. IV"), R. 163, at Page ID # 1583-84.)

(ECF No. 177 at 1.)

The Court finds this proposed finding of fact is supported by the credible evidence in the record.

**Proposed Fact 2:**

> 2. The same day, Mr. Scott was taken to the Robbery Bureau of the Memphis Police Department and placed in a secure interview room at approximately 5:15 p.m. (SHT I, R. 89, at PageID # 213-214.) The interview room was no larger than a hall closet, containing a metal bench with leg restraints, a table, and a computer. (Trial Tr. IV, R. 163, at Page ID # 1557-1558.) Mr. Scott was handcuffed to the bench. Id. at Page ID # 1558.

(ECF No. 177 at 1.)

The Court finds these proposed findings of fact are not supported by the credible evidence in the record. Defendant's characterization of the interview room as "no larger than a hall closet" is directly contradicted by Taylor's actual testimony to which Defendant purports to cite. Taylor testified at the trial the interview room was "a little larger than a hall closet." (ECF No. 163 at PageID 1557:24.) Because this vague statement of size has little evidentiary value, the Court relies on Taylor's testimony at the suppression hearing, which estimated the size of the interview room as either "six-by-eight" or "eight-by-ten." (ECF No. 89 at PageID 225:13-14.) Recognizing that Hutchison's testimony at trial estimated the size of the room as "10-by-15" (id. at PageID 279:8-12), the Court finds that the characterization of the interview room as a "closet" is misleading. Further, the credible proof also is that only

Scott's leg was handcuffed to the bench.  (Id. at PageID 226:2–18.)

**Proposed Fact 3:**

> 3. At approximately 8:10 p.m., Sergeant James Taylor and Detective Qudeer Smith, at the behest of case coordinator, Detective Eric Hutchison, entered the interview room to question Mr. Scott about the robbery.  (SHT I, R. 89, at Page ID # 216.)  Mr. Scott's Miranda warnings were read from an Advice of Rights form used by the detectives, as follows: You have the right to remain silent.  Anything you say can be used against you in a court of law.  You have the right to have a lawyer, either of your own choice or court appointed, if you are unable to afford one and to talk to your lawyer before any questioning and to have him with you during questioning, if you wish.  (Trial Tr. IV, R.163, at Page ID # 1563; see also, Govt.'s Resp. Def.'s 1st Mot. Suppress, Exh. D: Advice of Rights form for 05/28/08 ("05/28/08 Advice of Rights form'), R. 64-1, at Page ID # 176.)

(ECF No. 177 at 2 (footnotes omitted).)

The Court finds these proposed findings of fact are supported by the credible evidence in the record.

**Proposed Fact 4:**

> 4. Mr. Scott was then asked on the form whether he understood these rights, and he wrote "yes" on the form.  (Govt.'s Resp. Def.'s 1st Mot. Suppress, Exh. D: 05/28/08 Advice of Rights form, R. 64-1, at Page ID # 176.)  The form also contained the question: "Having these rights in mind, do you wish to talk to us now?"  Id.  Mr. Scott wrote "no" in answer to this question on the form.  Id.

(ECF No. 177 at 2.)

The Court finds these proposed findings of fact are supported by the credible evidence in the record.

**Proposed Fact 5:**

> 5. Sergeant Taylor asked Mr. Scott, "Is that the final
> . . . ." (Trial Tr. IV, R. 163, at Page ID # 1564.)
> Mr. Scott answered that he did not want to speak with
> Taylor at that moment, but he might talk at a later
> time.  Id.

(ECF No. 177 at 2.)

Taylor's trial testimony includes the partial statement he made to Scott, "Is that the final—" while the suppression hearing testimony does not.  (Compare ECF No. 163 at PageID 1563:25-1564:3, with Hr'g Tr., ECF No. 89, at PageId 219:5-7.) The Court finds the suppression hearing testimony to be the appropriate testimony on which to rely.  Taylor's suppression hearing testimony reveals that he asked Scott, "[D]o you want to talk to us now, and he basically told me I do not want to talk right now, but I will talk to you later." (Hr'g Tr., ECF No. 89, at PageID 219:5-7.)  The contemporaneously prepared report (ECF No. 88-7) does not indicate what Taylor said to Scott, but does indicate that after advising him of his Miranda rights, Scott "refused to speak w/them and said he might speak at a later time." (ECF No. 88-7 at PageID 2005.)  The differences in the testimony are irrelevant to the issue of whether the officers ceased questioning Scott.  The Court finds the record supports the fact that Scott told officers he did not want to talk to them but that he might talk at a later time.

**Proposed Fact 6:**

> 6. The officers stopped questioning and left the room. Id. at Page ID # 1559.

(ECF No. 177 at 2.)

The Court finds this proposed finding of fact is supported by the credible evidence in the record.

**Proposed Fact 7:**

> 7. Sergeant Taylor went to speak to Detective Hutchison, telling him that Mr. Scott did not want to make a statement that night, but he might want to talk later. (SHT I, R. 89, at [PageID] 219.)

(ECF No. 177 at 2.)

The Court finds these proposed findings of fact are supported by the credible evidence in the record.

**Proposed Fact 8:**

> 8. At 11:54 p.m. on May 28, 2008, Sergeant Taylor prepared a written memorandum labeled "SSTF Supplement," regarding his interview with Mr. Scott. Id. at ; (see also Govt.'s Resp. Def.'s 1st Mot. Suppress, Exh. A: SSTF Supplement by Sgt. James A. Taylor ("Taylor Memo"), R. 64-1, at Page ID # 164-165. According to the Taylor Memo:

> > Sgt. Taylor read the Miranda rights form to Scott who listened to his rights. Sgt. Taylor also gave Scott the Miranda form to review for himself. Scott reviewed the form and signed the form indicating that he understood his rights. Scott also signed the form saying he did not want to give a statement regarding the robbery of the O'Reilly's on May 28, 2008. Sgt. Taylor and Detective smith [sic] spoke to Scott about procedures and policies involving the right forms. Scott advised he knows he has some problems and has previously been arrested

47

> for aggravated robbery and when he gave a
> statement last time admitting what he did,
> he went to jail for 3 and ½ years. Scott
> verbally advised that he was not treated
> fairly last time by being completely honest
> and tonight was no different. Scott stated
> he may want to talk later but not tonight.
> Scott stated his main concern was for his
> daughter and girlfriends [sic] welfare.

> (Gov't.'s Resp. Def.'s 1st Mot. Suppress, Exh. A:
> Taylor Memo, R. 64-1, at Page ID # 165.)

(ECF No. 177 at 3.)

The Court finds these proposed findings of fact are

consistent with the credible evidence in the record and that the

Taylor memorandum is a partial recitation of events which have

now been more fully developed.

**Proposed Fact 9:**

> 9. At some point during this process, Sergeant Taylor
> informed Detective Hutchison that Mr. Scott was
> expressing custodial concern about his 18-month old
> daughter and wanted someone to contact his girlfriend.
> (Trial Tr., Mar. 29, 2010 ("Trial Tr. V"), R. 164, at
> Page ID #1700.) Detective Hutchison permitted a phone
> call on behalf of Mr. Scott. Id. Mr. Scott, however,
> was never told the call had been made. (Suppression
> Hr'g Tr. II ("SHT II"), R. 90, at Page ID #335.)

(ECF No. 177 at 3.)

The Court finds these proposed findings of fact are not

supported by the credible evidence in the record. Taylor's

testimony at the suppression hearing was, "I believe I tried to

call his girlfriend. I can't remember if I got in touch with

them or not." (Hr'g Tr., ECF No. 89, at PageID 220:18–19.)

Hutchison's testimony at the suppression hearing was as follows,

> Sergeant Taylor, he did come back and tell me that, hey, I have spoken with the mother of the child – the mother of the child is different than his girlfriend or something like that. He made it happen, he made it happen, that's what he told me. He spoke to me and told me he made it happen.

(Id. at PageID 247:24-248:4.) Scott's testimony does not indicate that he was told of the phone call, nor does it indicate that this information was withheld from him. (See Hr'g Tr., ECF No. 90, at PageID 335:9–20.) The Court finds that the trial testimony cited by Defendant does not "cast doubt" on the Court's initial understanding of the events.

**Proposed Fact 10:**

> 10. Arrangements were made to house Mr. Scott at the jail located in Bartlett, Tennessee. (Trial Tr. V, R. 164, at Page ID # 1053.)

(ECF No. 177 at 3.)

The Court finds this proposed finding of fact is supported by the credible evidence in the record.

**Proposed Fact 11:**

> 11. Detective Hutchinson, Sergeant Tim Wilson, and Officer Hugh Smith escorted Mr. Scott down to the transport vehicle when it arrived. (Trial Tr. IV, R. 163, at Page ID # 1598.) According to Detective Hutchinson, as he was about to put Mr. Scott in the back of the vehicle, Mr. Scott turned to him and said one of two things. The first version is as follows:

> > Anthony Scott looked at me and said, hey, it's a lot, isn't it. I said it sure is. He

> said, look, I know I need to talk to y'all
> about all of this, I just can't right now,
> let me get my head together, let me get some
> rest and maybe tomorrow I'll talk to y'all
> about it.

> Id. at Page ID # 1599.  The second version is: "When I
> was putting him in that vehicle, he told me that no
> lawyer or anybody can help me now, just God, give him
> until tomorrow, let me get my head together.["]  Id. at
> Page ID # 1606.

(ECF No. 177 at 3-4.)

The Court finds the suppression hearing testimony and
Hutchison's contemporaneously prepared memorandum to be the
credible evidence.  The memorandum states,

> Upon arriving at the transport vehicle, Anthony Scott
> said, "Hey! It's a lot ain't it?"  The writer
> responded yes, it sure is.  Scott said, "I know it is!
> And I need to talk to ya'll, but I just can't right
> now.  Give me till tomorrow, to get my head together,
> then I will be ready to talk to ya'll.  Can't no
> lawyer or nobody help me now, just GOD!"  The writer
> told Scott to get some rest and his head together and
> he'd be brought back in for an interview the next day.

(ECF No. 88-7 at PageID at 2005.)  Hutchison's testimony at the
suppression hearing was similar:

> [A]s we were about to put him in the back of the
> vehicle, Anthony Scott looked at me and said it's a
> lot, isn't it?  And I said yes, it is.  He said, hey,
> look, I know I need to talk to y'all, I just can't do
> it right now, let me get my head together, let me get
> my head together, and I will talk to y'all later.  He
> said I'm tired, let me get some rest, I will talk to
> you later.  I know I have got to talk to you.  My
> words to Mr. Scott was go ahead, get you some rest, I
> will have you brought back tomorrow, and if you choose
> to talk to us at that time, then we'll talk.

(Hr'g Tr., ECF No. 89, at PageID 249:18-250:2.)  As stated,
infra p. 75 n.7, the Court finds these statements are
reconcilable, accurate, and credible.  These statements
establish that Scott reinitiated contact with police.

**Proposed Fact 12:**

> 12. Mr. Scott was transported to the Bartlett jail
> just after 10:00 p.m. (Trial Tr. V, R.164, at Page ID
> # 1704.)

(ECF No. 177 at 4.)

The Court finds this proposed finding of fact is not
supported by the evidence in the record.  Defendant misapplies
an isolated statement to reach an inaccurate conclusion.  The
memorandum by Hutchison states that at "2200hrs, Agent David
Smith reported back that he had coordinated the hold/temporary
housing w/Bartlett."  (ECF No. 88-7 at PageID 2005.)  Hutchison
later states in his memorandum that at "1135hrs, Officer Gurley
arrived at the robber office w/the transport caged vehicle to
transport Anthony Scott to Bartlett's jail."  (Id.)  Although
the time referenced is "1135hrs" and not "2335hrs," the time of
night is corroborated by Hutchison's testimony at the
suppression hearing.  At the hearing, Hutchison stated, "[A]t
approximately 11:10, 11:15, the caged vehicle investigator
showed up, I shackled Mr. Scott at the wrists, I shackled his
ankles; and myself, Sergeant Wilson and Detective Smith escorted
Mr. Scott down to the transport vehicle."  (Hr'g Tr., ECF No.

89, at PageID 249:4-8.)  Further corroborating Hutchison's

recollection are the Bartlett Police Department's prisoner

information documents, entered as Exhibit 12 at the suppression

hearing, which note that Defendant entered its custody at 12:47

a.m. on May 29, 2008.  (ECF No. 88-12 at PageID 2046.)

**Proposed Fact 13:**

> 13. At Detective Hutchison's request, Mr. Scott was
> prohibited from making phone calls while at the
> Bartlett jail.  Id. at Page ID # 1703.  Id. at 1054.

(ECF No. 177 at 4.)

The Court finds this proposed finding of fact is supported

by the credible evidence in the record.

**Proposed Fact 14:**

> 14. The following day, May 29, 2008, Detective
> Hutchison had two officers go to the Bartlett jail and
> bring Mr. Scott to the Robbery Bureau at 201 Poplar,
> at approximately 5:00 p.m. (Trial Tr. IV, R. 163, at
> Page ID # 1601.)  Upon Mr. Scott's arrival at
> approximately 6:15 p.m., he was taken to a smaller
> interview room in the Robbery Bureau and shackled to a
> bench.  (SHT I, R.89, at Page ID # 279.)

(ECF No. 177 at 4.)

The Court finds Defendant's first proposed finding of fact

— that Hutchison and two other officers brought Scott to 201

Poplar at approximately 5:00 p.m. — is supported by the credible

evidence in the record.  The Court finds Defendant's second

proposed finding of fact is incomplete and misleading without

reference to the estimated sizes of the interview rooms as recalled by Hutchison.

The suppression hearing testimony of Hutchison indicates that the interview room used on May 29 was "much smaller" in relation to the room Scott was secured in on May 28. Hutchison described the large room as "about 10-by-15," while the room used on May 29 was "about six-by-ten." (See Hr'g Tr., ECF No. 89, PageID 279:7-21.) Hutchison testified,

> Mr. Scott was – on the 28th, he was secured in the large room in the Homicide Office, which is right next door to the Robbery Office. There's walk-through doors they connected to. That room is actually about 10-by-15 with a large conference table in it. If you have ever seen ["T]he First 48["], that's the room, and it has a two-way mirror in it. The next day [May 29, 2008] he was taken to interview Room B in the Robbery Office, and it is much smaller, we have three individual rooms that are about six-by-ten, and they have two way mirrors, and that room consists of a much smaller type conference table, I would probably say three-by-four maybe, two-by-three, and he's secured to a bench, that's a metal bench that's affixed to the floor, it is bolted to the floor, and it has about four-inch cushion that is attached to the top of it.

(Id. at PageID 279:13-21.) As indicated, supra Defendant's Proposed Fact 2, the descriptions of the size of the interview room in which Defendant was placed on May 28, 2008, vary from "six-by-eight" to "eight-by-ten" to "ten-by-fifteen." The testimony also indicates that while Scott was secured to the bench, his hands were free. (Id. at PageID 279:21-24.)

**Proposed Fact 15:**

> 15. At approximately 7:00 p.m., Detective Hutchison went into the interview room with Sergeant Wilson to interview Mr. Scott. (Trial Tr. IV, R. 163, at Page ID # at 1595, 1601.) Detective Hutchison offered Mr. Scott water and a restroom break and Mr. Scott accepted a cup of water. <u>Id.</u> at Page ID # 1601-1602. Mr. Scott stated he was hungry because he had not eaten at Bartlett. <u>Id.</u> at Page ID # 1602; (see also, SHT I, R. 89, at 258; Trial Tr. V, R. 164, at Page ID #1706.) He requested a pizza. <u>Id.</u> He also requested to see his daughter and his mother. (Trial Tr. IV, R. 163, at Page ID # 1602.) Mr. Scott was told that he would be fed. <u>Id.</u>

(ECF No. 177 at 4-5.)

The Court finds these proposed findings of fact are supported by the credible evidence in the record.

**Proposed Fact 16:**

> 16. Mr. Scott asked again about contacting his daughter to check on her to see if she was safe. (SHT II, R. 90, at Page ID # 337.) He was concerned that an entire day had passed and he did not know what was going on with her, nor had he spoken with any member of his family, resulting in additional concern for their worry over him. <u>Id.</u> He was told by Detective Hutchinson, "[Y]ou give us something, we give you something." <u>Id.</u>

(ECF No. 177 at 5.)

The Court finds these proposed findings of fact are not supported by the credible evidence in the record. Scott is the only witness to testify that this exchange took place and the Court has determined that Scott's testimony is not credible.

**Proposed Fact 17:**

17. According to Detective Hutchison, Mr. Scott then allegedly volunteered to speak. (Trial Tr. IV, R. 163, at Page ID # 1602.) Mr. Scott was again read his Miranda warnings from the Advice of Rights form, and he began to give statements about the various robberies for which he was indicted. Id. at Page ID # 1603-1604.

(ECF No. 177 at 5.)

The Court finds these proposed findings of fact are supported by the credible evidence in the record. (See also ECF No. 88-4.)

**Proposed Fact 18:**

18. Detective Hutchison did not ask Mr. Scott about the May 28th robbery of the O'Reilly Auto Parts store on Cleveland Street. (Trial Tr. IV, R. 163, at Page ID # 1628-1629.) This was based on Sergeant Taylor's initial report to Hutchison on May 28th, that Mr. Scott had invoked his Miranda rights and had chosen not to talk, though he might talk later. Id. at Page ID # 1629.

(ECF No. 177 at 5.)

The Court finds these proposed findings of fact are supported by the credible evidence in the record.

**Proposed Fact 19:**

19. Instead, Mr. Scott was asked to confess to the following robberies: (1) Teresa Cooper (Ms. Winners) at 5850 Winchester on May 3, 3008; (2) Angela Springfield (KFC) at 1699 Union Avenue on May 3, 2008; (3) an O'Reilly Auto Parts store at 2335 Lamar on May 8, 2008; (4) an O'Reilly Auto Parts store at 4110 South Third Street on May 15, 2008; (5) Antonio

Scott[5] at 4110 South Third on May 15, 2008; and (6) an O'Reilly Auto Parts store at 5099 Yale on May 15, 2008. (Trial Tr. IV, R. 163, at Page ID # 1636, 1641, 1649, 1655; Trial Tr. V, R. 164, at Page ID # 1678, 1685.)

(ECF No. 177 at 5.)

The Court finds these proposed findings of fact are not supported by the credible evidence in the record. The Court finds that Scott was not "asked to confess" to the listed robberies. The Court finds that Scott, after reinitiating conversation with Hutchison, was asked about the robberies and confessed to his involvement. The pertinent trial testimony is as follows.

Regarding (1), the robbery of "Teresa Cooper (Ms. Winners) at 5850 Winchester on May 3, [2]008":

Q. Okay. And would you go through and tell the jury what question you asked next and what answer was given by the defendant?

A [Hutchison]. Question: Did you participate in the robbery of Teresa Cooper, Ms. Winner's, which occurred at 5850 Winchester on Thursday, May 3, 2008 at approximately 11:00 o'clock p.m.? Answer: Yes. Question: Did anyone else participate in this robbery with you, if so, name them? Answer: No, sir.

(ECF No. 164 at PageID 1685:1-10.)

Regarding (2), the robbery of "Angela Springfield (KFC) at 1699 Union Avenue on May 3, 2008":

---

[5] Defendant has misidentified the victim of this robbery, Antonio Stewart, as "Antonio Scott."

Q. Again, if you would just go through and tell the jury what questions you asked and what the defendant, Anthony Scott, said.

A [Hutchison].    Yes, sir.    Question: Did you participate in the robbery of an Angela Springfield (KFC) which occurred at 1699 Union on Thursday, May 3, 2008 at approximately 11:50 a.m.?  Answer: Yes, sir. Question: Did anyone else participate in this robbery with you, if so, name them?  Answer: No, I was solo.

(ECF No. 164 at PageID 1678:1-11.)

Regarding (3), the robbery of the "O'Reilly Auto Parts store at 2335 Lamar on May 8, 2008":

Q. The next written statement that you went through with Mr. Scott, is it regarding the robbery of the O'Reilly at 2335 Lamar on May 8th, 2008?

A [Hutchison].  Yes, sir.

Q. Did you ask Mr. Anthony Scott if he did that robbery of the O'Reilly's on Lamar?

A. Yes, sir, I did.

Q. What did he say?

A. He said yes, he did.

(ECF No. 163 at PageID 1655:16-24.)

Regarding (4), the robbery of "an O'Reilly Auto Parts store at 4110 South Third Street on May 15, 2008":

Q. Detective Hutchison, was the first typewritten statement regarding the robbery of the O'Reilly's Auto Parts at 4110 South Third on May 15th, 2008?

A. Yes, sir.

Q. And did you ask Mr. - did you ask Mr. Anthony Scott if he took part in that robbery?

A. Yes, sir, I did.

Q. What did he tell you?

A. He said yes.

(ECF No. 163 at PageID 1635:24-1636:7.)

Regarding (5), the robbery of Antonio Stewart at 4110 South Third on May 15, 2008:

> Q. And what is the next question that you asked Anthony Scott?
>
> A [Hutchison]. Did you participate in the robbery of Antonio Stewart, O'Reilly's, which occurred at 4110 South Third on Thursday, May 15, 2008 at 6:10 p.m.
>
> Q. And what did Anthony Scott answer?
>
> A. He wrote yes, and he wrote his initials beside it.

(ECF No. 163 at PageID 1641:10-16.)

Regarding (6), the robbery of "an O'Reilly Auto Parts store at 5099 Yale on May 15, 2008":

> Q. Did you next ask Anthony Scott to give a written statement about the May 15th, 2008 robbery of the O'Reilly's Auto Parts Store at 5099 Yale?
>
> A [Hutchison]. Yes, sir, I did.
>
> Q. Did he agree to do that?
>
> A. Yes.
>
> Q. Did you ask him if he took part in that robbery?
>
> A. Yes, sir, I did.
>
> Q. What did he say?
>
> A. He said yes, he did rob that business.

(ECF No. 163 at PageID 1648:25-1649:9.)

**Proposed Fact 20:**

> 20. Mr. Scott was not fed until 10:55 p.m. on May 29,
> 2010. (Trial Tr. V, R. 164, at Page ID # 1707.)  He
> gave further statements thereafter and was transported
> back to Bartlett at midnight.  Id. at Page ID # 1708.

(ECF No. 177 at 5-6.)

The Court finds these proposed findings of fact are

supported by the credible evidence in the record.

**Proposed Fact 21:**

> 21. On May 30, 2008, at approximately 11:47 a.m., Mr.
> Scott was once again retrieved from the Bartlett jail
> and brought to the Robbery Office at the request of
> Detective Hutchison.  (Trial Tr. V, R. 164, at Page ID
> # 1763-1764.)  Mr. Scott was interviewed by Detectives
> Smith and Beasley beginning at about 12:38 p.m. Id. at
> Page ID # 1765.  Mr. Scott confessed to robbing the
> following: (1) an Autozone store at 1363 Getwell on
> January 17, 2008; (2) a Krystal's at 2663 Mt. Moriah
> on February 19, 2008; (3) a Krystal's at 4395 Elvis
> Presley on March 25, 2008; (4) an Advanced Auto Parts
> store at 1427 Airways on April 4, 2008; (5) an
> Advanced Auto Parts store at 6645 Shelby Drive on
> April 14, 2008; and (6) an Autozone store at 1510
> Elvis Presley on April 18, 2008.  (Trial Tr. V, R.
> 164, at Page ID # 1724, 1732, 1738, 1743-1744, 1749,
> 1751-1752.)

(ECF No. 177 at 6.)

The Court finds these proposed findings of fact are

supported by the credible evidence in the record.  The Court

further finds that Defendant was properly read his Miranda

rights and validly waived them before the remaining confessions

were given.  (ECF No. 164 at PageID 1718:1-10; 1721:13-1722:20;
see also ECF No. 88-9.)

**Proposed Fact 22:**

22.  At approximately 4:40 p.m., after giving his
statements, Mr. Scott was permitted to see his mother
and his daughter in the interview room.  Id. at Page
ID # 1709, 1758, 1770.   Mr. Scott's leg remained
shackled.  Id. at 1770.

(ECF No. 177 at 6.)

The Court finds these proposed findings of fact are

supported by the credible evidence in the record.

**Proposed Fact 23:**

23.  On June 9, 2008, a detailed memorandum was entered
by   Detective   Eric   Hutchison   regarding   his
investigative activities on May 28th, 29th, and 30th,
2008.  (SHT I, R. 89, at Page ID# 264-265; see also
Govt.'s Resp. Def.'s 1st Mot. Suppress, Exh B:
Memorandum prepared by Eric Hutchison on 06/09/08
("Hutchison's 06/09/08 Memo"), R. 64-1, at Page ID #
166.)   With regard to Mr. Scott's first interview,
conducted by Sergeant Taylor and Detective Smith on
May 28, 2008, Detective Hutchison wrote:

It was decided that Anthony Scott was to be
initially interviewed by Sgt. Taylor and
Det. Smith.   At 2005 hours, they began the
interview in the homicide office.   Sgt.
Taylor and Det. Smith shortly reported back,
that after advising Anthony Scott of his
"Miranda Rights" concerning this case only,
Scott refused to speak w/them and said he
might speak at a later time.   Both Sgt.
Taylor and Det. Smith said Scott did not
request an attorney.   The signed Miranda
Advice form is included in this case.   All
communications with Anthony Scott regarding
this case were discontinued.

Id. at Page ID # 170.

(ECF No. 177 at 6-7.)

The Court finds these proposed findings of fact are supported by the credible evidence in the record.

**B.    Government's Proposed Findings of Fact**

The Government submits thirty-six proposed findings of fact.[6]  (ECF No. 181 at 3-7.)  The Government's proposed facts are as follows.

**Proposed Fact 1:**

> [1.] In May 2008, police in Memphis were tracing a robber who had robbed over 40 auto parts stores and fast food restaurants in Memphis over the previous two years.  (E. Hutchison at Supp. Hrg. TR. 39-30.)

(ECF No. 181 at 3.)

The Court finds this proposed fact is supported by credible evidence in the record.

**Proposed Fact 2:**

> [2.] The robber used the same modus operandi in all the robberies.  (Id., p. 39.)

(ECF No. 181 at 3.)

The Court finds this proposed fact is supported by credible evidence in the record.

**Proposed Fact 3:**

> [3.] The robber always wore a FedEx jacket and what appeared to be a FedEx uniform.  (Id., pp. 39-30.)

---

[6] The Government submitted its facts in narrative form.  For the sake of uniformity, the Court has extracted and numbered each proposed fact.

(ECF No. 181 at 3.)

The Court finds this proposed fact is supported by credible evidence in the record.

**Proposed Fact 4:**

> [4.] Once inside the victim store, the robber would also squat down and "duck walk" through the store in an apparent effort to avoid detention from outside. (Id.)

(ECF No. 181 at 3.)

The Court finds this proposed fact is supported by credible evidence in the record.

**Proposed Fact 5:**

> [5.] The robber, who always wore a mask, used a silver revolver in many of the robberies. (Id.)

(ECF No. 181 at 3.)

The Court finds this proposed fact is supported by credible evidence in the record.

**Proposed Fact 6:**

> [6.] He also committed many of the robberies on days when it was raining. (Id.)

(ECF No. 181 at 3.)

The Court finds this proposed fact is supported by credible evidence in the record.

**Proposed Fact 7:**

> [7.] The defendant was apprehended after a rainy-day robbery of an O'Reilly auto parts store on May 28, 2008. (Id., pp. 41-42.)

(ECF No. 181 at 3.)

The Court finds this proposed fact is supported by credible evidence in the record.

**Proposed Fact 8:**

> [8.] Officers transported him to the Robbery Bureau office at police headquarters. (J. Taylor at Supp. Hrg. TR. 10-11.)

(ECF No. 181 at 3.)

The Court finds this proposed fact is supported by credible evidence in the record.

**Proposed Fact 9:**

> [9.] Memphis police detective [James A.] Tony Taylor spoke with the defendant at approximately 5:15 p.m., which was shortly after Scott arrived at the Robbery Bureau office. (Id., p. 12.)

(ECF No. 181 at 3-4.)

The Court finds this proposed fact is supported by credible evidence in the record.

**Proposed Fact 10:**

> [10.]    At that time, Detective Taylor only gathered brief biographical information from Scott. (Id., pp. 12-13.)

(ECF No. 181 at 4.)

The Court finds this proposed fact is supported by credible evidence in the record.

**Proposed Fact 11:**

> [11.]    Detective Taylor then left Scott secured in an interview room until about 8:10 p.m. (Id., p. 14.)

(ECF No. 181 at 4.)

The Court finds this proposed fact is supported by credible evidence in the record.

**Proposed Fact 12:**

> [12.]     At about 8:10 p.m., Detective Taylor, along with another detective, returned to speak with Scott in the interview room.  (<u>Id.</u>, p. 14.)

(ECF No. 181 at 4.)

The Court finds this proposed fact is supported by credible evidence in the record.

**Proposed Fact 13:**

> [13.]     Detective Taylor read a <u>Miranda</u> rights form aloud to the defendant and allowed Scott to read the form himself.  (<u>Id.</u>, pp. 14-16.)

(ECF No. 181 at 4.)

The Court finds this proposed fact is supported by credible evidence in the record.

**Proposed Fact 14:**

> [14.]     When Detective Taylor then asked Scott if he understood his <u>Miranda</u> rights, Scott replied that he did. (Id., p. 15.)

(ECF No. 181 at 4.)

The Court finds this proposed fact is supported by credible evidence in the record.

**Proposed Fact 15:**

> [15.]     The form included the following language:

> You have the right to remain silent.
> Anything you say can be used against you in
> a court of law. You have a right to have a
> lawyer, either of your own choice, or court
> appointed. If you are unable to afford one;
> and to talk to your lawyer before answering
> any questions, and to have him with you
> during questioning, if you wish.

> Below the warning, the form included two questions and
> spaces below the questions in which Scott wrote the
> answers to the questions as follows:

> > Q: Do you understand each of these rights
> > I've explained to you?
> > A: Yes
> > Q: Having these rights in mind, do you wish
> > to talk to us now?
> > A: No

> (Supp. Hrg. TR., p. 16, Exhibit 1 [ECF No.88-1]).

(ECF No. 181 at 4-5.)

The Court finds this proposed fact is supported by credible

evidence in the record.

**Proposed Fact 16:**

> [16.] After Scott filled out these answers,
> Detective Taylor asked Scott what he meant by the "no"
> answer he gave to the second question. (J. Taylor at
> Supp. Hrg. TR. 15.)

(ECF No. 181 at 5.)

The Court finds this proposed fact is supported by credible

evidence in the record.

**Proposed Fact 17:**

> [17.] Scott told Detective Taylor that "I will
> talk to you later, but I do not want to talk right now
> at this time." (Id., pp. 15, 17, 32-33.)

(ECF No. 181 at 5.)

The Court finds this proposed fact is supported by credible evidence in the record.

**Proposed Fact 18:**

[18.]    Scott elaborated to Taylor that:

> He did not want a lawyer, he just wanted some time. He basically told me he wanted some time to talk to his girlfriend and make some arrangements for his 19-month old daughter, but that he would talk to us later.

(Id., p. 15.).

(ECF No. 181 at 5.)

The Court finds this proposed fact is supported by credible evidence in the record.

**Proposed Fact 19:**

[19.]    After Scott told Detective Taylor that he did not want to talk about the robbery but that he would later, neither Taylor nor any other officer questioned Scott any further. (Id., pp. 15, 17-18; E. Hutchison at TR. 47.)

(ECF No. 181 at 5.)

The Court finds this proposed fact is supported by credible evidence in the record.

**Proposed Fact 20:**

[20.]    At about 11:00 p.m. on the night of May 28, 2008, Detective Hutchison took Scott to a transport vehicle to be taken to jail. (E. Hutchison at Supp. Hrg. TR. 47.)

(ECF No. 181 at 5.)

The Court finds this proposed fact is supported by credible evidence in the record.

**Proposed Fact 21:**

> At no time while taking Scott to the transport vehicle did Detective Hutchison attempt to talk with or question Scott. (TR. 47.)

(ECF No. 181 at 5.)

The Court finds this proposed fact is supported by credible evidence in the record.

**Proposed Fact 22:**

> [22.] As officers were about to put Scott into the vehicle, Scott told Hutchison, "[H]ey, look, I know I need to talk to y'all, I just can't do it right now, let me get my head together, and I will talk to y'all later. . . I'm tired, let me get some rest, I will talk to you later. I know I have got to talk to you." (Id.)

(ECF No. 181 at 5-6.)

The Court finds this proposed fact is supported by credible evidence in the record.

**Proposed Fact 23:**

> [23.] Detective Hutchison told Scott that he would have Scott brought back the next day and that Scott could talk then if he chose. (Id., p. 48.)

(ECF No. 181 at 6.)

The Court finds this proposed fact is supported by credible evidence in the record.

**Proposed Fact 24:**

> [24.] The next day, May 29, 2008, Detective Hutchison had Scott transported to the Robbery Bureau office at about 6:15 p.m. (<u>Id.</u>)

(ECF No. 181 at 6.)

The Court finds this proposed fact is supported by credible evidence in the record.

**Proposed Fact 25:**

> [25.] At about 7:00 p.m., Detective Hutchison and Sergeant Wilson came in to talk with Scott. (<u>Id.</u>, p. 49.)

(ECF No. 181 at 6.)

The Court finds this proposed fact is supported by credible evidence in the record.

**Proposed Fact 26:**

> [26.] Before Hutchison and Wilson could ask any questions, however, Scott indicated he wanted to talk and started trying to talk about the case. (<u>Id.</u>)

(ECF No. 181 at 6.)

The Court finds this proposed fact is supported by credible evidence in the record.

**Proposed Fact 27:**

> [27.] At this point the officers stopped Scott. (<u>Id.</u>)

(ECF No. 181 at 6.)

The Court finds this proposed fact is supported by credible evidence in the record.

**Proposed Fact 28:**

[28.]    Detective Hutchison provided Scott with another Miranda rights form, which Hutchison had Scott read aloud. (Id.)

(ECF No. 181 at 6.)

The Court finds this proposed fact is supported by credible evidence in the record.

**Proposed Fact 29:**

[29.]    Scott told the officers he wanted to talk and wrote in "yes" on the part of the Miranda form that said, "Having these rights in mind, do you wish to talk to us now?" (Id.)

(ECF No. 181 at 6.)

The Court finds this proposed fact is supported by credible evidence in the record.

**Proposed Fact 30:**

[30.]    Then, without Detective Hutchison having to ask any questions, Scott launched into a lengthy narrative explaining why and how he committed all those robberies in Memphis involving a suspect in a FedEx coat. (Id., pp. 49-53).

(ECF No. 181 at 6.)

The Court finds this proposed fact is supported by credible evidence in the record.

**Proposed Fact 31:**

[31.]    The next day, May 30, 2008, detectives brought defendant back to the Robbery Bureau office at about noon. (B. Beasley at Supp. Hrg., TR., pp. 94-95, 102,103.)

(ECF No. 181 at 6.)

The Court finds this proposed fact is supported by credible evidence in the record.

**Proposed Fact 32:**

> [32.]     Defendant Scott was again advised of his <u>Miranda</u> rights and again indicated he wanted to speak with the officers. (<u>Id.</u>, pp. 95-96.)

(ECF No. 181 at 6-7.)

The Court finds this proposed fact is supported by credible evidence in the record.

**Proposed Fact 33:**

> [33.]     He gave another series of written confessions, with each written statement again being preceded by written Miranda warnings. (<u>Id.</u>, p. 100.)

(ECF No. 181 at 7.)

The Court finds this proposed fact is supported by credible evidence in the record.

**Proposed Fact 34:**

> [34.]     At no time on May 28, May 29, or May 30, 2008, did the defendant ever ask for a lawyer. (J. Taylor at Supp. Hrg. TR. 20: E. Hutchison at Supp. Hrg. TR. 63; B. Beasley at Supp. Hrg. TR. 98.)

(ECF No. 181 at 7.)

The Court finds this proposed fact is supported by credible evidence in the record.

**Proposed Fact 35 and 36:**

> [35.]     The defendant testified at the suppression hearing. He said he told Detective Taylor during their first encounter that he wanted a lawyer, and

that he did not want to say anything to the officers. (A. Scott at Supp. Hrg. TR. 129.)

[36].     The defendant also said that before he was transferred from the Robbery Bureau back to jail on May 28, Detective Hutchison said "[w]e're going to take you to another jail until you ready to say something, and we will come back and get you tomorrow and see if you ready then." (Id., p. 133.)

(ECF No. 181 at 7.)

For the above two proposed facts, the Government "submits that this testimony by the defendant is not credible and that the Court should instead credit the testimony of Detectives Hutchison and Taylor." (Id.)  The Court agrees and finds these proposed facts are not supported by credible evidence in the record.

## IV.   ANALYSIS

The Sixth Circuit having determined that Defendant properly invoked his right to counsel under the Fifth Amendment, the first issue before the Court on remand is whether Defendant reinitiated contact with police, thereby waiving the right to counsel he had previously invoked.  The second issue before the Court is, if Defendant did reinitiate contact with police, were his subsequent confessions voluntary.  The Court will address each issue in turn.

### A.   Reinitiation with Police

"[T]he presumption raised by a suspect's request for counsel — that he considers himself unable to deal with the

pressures of custodial interrogation without legal assistance —
does not disappear simply because the police have approached the
suspect, still in custody, still without counsel, about a
separate investigation." Arizona v. Roberson, 486 U.S. 675, 683
(1988). "[W]hen an accused has invoked his right to have
counsel present during custodial interrogation, a valid waiver
of that right cannot be established by showing only that he
responded to further police-initiated custodial interrogation
even if he has been advised of his rights." Edwards v. Arizona,
451 U.S. 477, 484 (1981). "[A]n accused, . . . having expressed
his desire to deal with the police only through counsel, is not
subject to further interrogation by the authorities until
counsel has been made available to him, unless the accused
himself initiates further communication, exchanges, or
conversations with the police." Id. at 484–85.

An "initiation" is any statement by the defendant that
evinces "a willingness and a desire for a generalized discussion
about the investigation; . . . not merely a necessary inquiry
arising out of incidents of the custodial relationship." Oregon
v. Bradshaw, 462 U.S. 1039, 1045–46 (1983) (plurality); see
United States v. Whaley, 13 F.3d 963, 967 (6th Cir. 1994)
(noting there was "little difference between the way the
plurality and the dissent phrased the standard to apply in
determining what constitutes an initiation," and that "[t]he

dissenters even indicated that they believed they were agreeing with the plurality on the standard to be applied"). Noting the plurality opinion in Bradshaw, the Sixth Circuit stated, "[A]n Edwards initiation occurs when, without influence by the authorities, the suspect shows a willingness and a desire to talk generally about his case." Whaley, 13 F.3d at 967; see United States v. Clay, 320 F. App'x 384, 388–89 (6th Cir. 2009) (applying Bradshaw and finding defendant's statement, "do you think I can talk to [the investigators] again?" after invoking her right to counsel was an Edwards "initiation," as use of the word "again" could "reasonably have been interpreted by the officer as relating generally to the investigation," as it suggests a resumption of their prior discussion).

Defendant argues that the police reinitiated contact with him before he had the opportunity to consult with an attorney, thereby violating his previously invoked right to counsel. (ECF No. 177 at 7.) Defendant asserts that the detectives reinitiated questioning by having him brought from the Bartlett Jail to the Robbery Office at 201 Poplar on May 29, 2008, after he had properly invoked his right to counsel on May 28, 2008. (Id. at 9-10.) Defendant states that while he "allegedly stated that he might speak to detectives at a later date, [Scott] was badgered into his confessions on May 29th and 30th." (Id. at 10 (citation omitted).) Defendant argues that there is "nothing in

the record showing that Mr. Scott initiated the May 29th and
30th interactions with the detectives or requested to see
detectives after he was first transported to the Bartlett Jail
on May 28, 2008." (Id.)

The Government argues that "the record shows that the
[D]efendant clearly initiated contact with Detective Hutchinson
on the night of May 28, 2008[,] at about 11:00 p.m.," therefore
Defendant's statements were properly admitted. (ECF No. 181 at
1.) The Government contends that the officers never
interrogated Defendant on May 28, 2008, after he indicated that
he did not want to talk to them. (Id. at 9.) The Government
asserts that Defendant reinitiated contact with police on the
night of May 28 by stating, "[H]ey, look, I know I need to talk
to y'all, I just can't do it right now, let me get my head
together, [. . .] I will talk to y'all later. I know I have got
to talk to you," as Hutchinson was placing Defendant in the
transport vehicle. (Id. at 8 (first alteration in original).)
The Government submits that this statement "clearly evinced a
willingness and a desire for a generalized discussion about the
investigation." (Id. (internal quotation marks omitted).) The
Government also asserts that Defendant "evinced a willingness"
to discuss the investigation the next day, May 29, 2008, when he
was brought back to the Robbery Office for questioning as
Defendant indicated he "wanted to talk and started trying to

74

talk about the case even before the officers could advise him

again of his <u>Miranda</u> rights." (<u>Id.</u> at 9.)

The Court finds that Defendant reinitiated contact with

police on the night of May 28, 2008.  Review of the record and

the parties' proposed findings of facts indicate that there is

no dispute that Defendant made the following statement,

> I know I need to talk to y'all, I just can't do it
> right now, let me get my head together . . . and I
> will talk to y'all later. . . . I'm tired, let me get
> some rest, I will talk to you later.  I know I have
> got to talk to you.

(<u>Compare</u> ECF No. 177 at 4, <u>with</u>, ECF No. 181 at 5-6;[7] <u>see also</u>

Hr'g Tr., ECF No. 89, at PageID 249:19-24.)  Defendant's

statement constitutes a resumption of the earlier discussion

with Taylor.  The Court also finds that Defendant persisted in

his reinitiation on May 29 by attempting to confess his crimes

even before the officers could read him his <u>Miranda</u> rights.

Under <u>Edwards</u> and <u>Bradshaw</u>, Defendant's statement that he

would talk with investigators the next day "could reasonably

have been interpreted as relating generally to the

investigation," and therefore "evinced a willingness and a

---

[7] Defendant quotes Hutchinson's testimony from Defendant's jury trial
regarding this exchange (ECF No. 163 at PageID 1599:1-6), while the
Government quotes Hutchinson's testimony from the hearing on the Motion to
Suppress (Hr'g Tr., ECF No. 89, at PageID 249:19-24).  Recognizing that a
reviewing court "is 'not restricted to considering evidence offered during
the hearing on the motion to suppress,'" <u>United States v. Perkins</u>, 994 F. 2d
1184, 1188 (6th Cir. 1993) (quoting <u>United States v. McKinney</u>, 379 F. 2d 259,
264 (6th Cir. 1967)), the Court finds these statements are consistent,
credible, and reconcilable, accurately recalling facts which constitute
reinitiation.  The Court also relies on the memorandum prepared by Hutchison,
as previously discussed, <u>supra</u> Pt. II.

desire for a generalized discussion about the investigation."
Bradshaw, 462 U.S. at 1045–46. The record demonstrates that the
officers understood Defendant's statement as a potential
reinitiation and therefore read him the Miranda warnings again
on May 29, before any further interrogation. Since Defendant
reinitiated contact with police on the night of May 28 and
waived his previously invoked right to counsel, it was not
improper for officers to transport Defendant from the Bartlett
Jail to the Robbery Office at 201 Poplar on May 29, 2008. As a
result, whether Defendant reinitiated contact with officers on
May 29 and 30 is not determinative because Defendant had already
reinitiated contact with officers on May 28, waiving his
previously invoked right to counsel. Further, after
reinitiating contact with police, Defendant was re-Mirandized on
May 29 and 30, signed an Advice of Rights form waiving his
rights on May 29 and May 30, and subsequently signed numerous
confessions to the business robberies.

Defendant argues that his Miranda custody never ended.
(ECF No. 177 at 9-10.) He contends that because he was not
allowed to talk to a lawyer before police met with him a second
time, and because of his incarceration at the Bartlett Jail on
the night of May 28, he was pressured into waiving his Miranda
rights on May 29 and May 30, in violation of Maryland v.

<u>Shatzer</u>, 130 S. Ct. 1213, 1219-20 (2010), and <u>Roberson</u>. (<u>Id.</u> at 7-11.)

<u>Shatzer</u> and <u>Roberson</u> are inapposite, however, as they concern the protections against police taking advantage of prolonged police custody in order to elicit a waiver of a suspect's rights or a confession. <u>See</u> <u>Shatzer</u>, 130 S. Ct. at 1223 (determining that fourteen days is the appropriate length of time for <u>Miranda</u> custody to dissipate, allowing officers to reinitiate contact with a suspect without violating an earlier invocation of the suspect's Fifth Amendment privileges); <u>Roberson</u>, 486 U.S. at 686 ("[Where] a period of three days elapsed between the unsatisfied request for counsel and the interrogation about a second offense, there is a serious risk that the mere repetition of the <u>Miranda</u> warnings would not overcome the presumption of coercion that is created by prolonged police custody.").

Defendant also relies on a recent Sixth Circuit case, <u>United States v. McWhorter</u>, Nos. 10-5939, 11-6228, 2013 WL 628417 (6th Cir. Feb. 20, 2013). In <u>McWhorter</u>, the court reiterated that <u>Shatzer</u>'s fourteen-day "cleansing period" for <u>Miranda</u> custody was sufficient, and found that a four-month gap in questioning did not result in a presumption that the Defendant's statements to police were involuntary. <u>McWhorter</u>, 2013 WL 628417, at *6-7. Defendant asserts that because the

court "found it important that the defendants in Edwards and its
progeny were all re-interrogated within three days" of invoking
their Miranda rights, the "court's decision indicates that a
lapse of three days between invocation of Miranda rights and
police re-interrogation may not be enough to prevent violation
of a defendant's Fifth Amendment rights." (ECF No. 182 at 2.)
Defendant contends that he was brought back and re-interrogated
before even one day elapsed after he invoked his Miranda rights
and therefore his statements were clearly involuntary.

In the instant case, Shatzer, Roberson, and McWhorter are
inapplicable as Defendant waived his right to counsel by
reinitiating contact with police the same night he was brought
in for questioning. There was no issue of "prolonged police
custody." Shatzer and Roberson are also distinct from the
instant case because in those cases the Court found no
reinitiation on the part of the defendants. In the instant
case, the Miranda custody ended once Defendant reinitiated
contact with police, therefore the officers' subsequent contact
with Defendant was not in violation of any Fifth Amendment
right.

**B. Coercion**

Having found no Edwards violation and having further found
that Defendant reinitiated contact with the police and thereby
waived his previously invoked right to counsel, the Court must

determine whether Defendant's waiver and confessions were
voluntary. The Court will determine "whether the purported
waiver [of his right to silence and presence of counsel] was
knowing and intelligent and found to be so under the totality of
the circumstances, including the necessary fact that the
accused, not the police, reopened the dialogue with the
authorities." Edwards, 451 U.S. at 486 n.9. "[T]his
determination depends 'upon the particular facts and
circumstances surrounding the case, including the background,
experience, and conduct of the accused.'" Bradshaw, 462 U.S. at
1046 (quoting North Carolina v. Butler, 441 U.S. 369, 374–75
(1979)).

A confession is involuntary if, in light of the totality of
the circumstances, "the will of the accused has been overwhelmed
by official pressure." United States v. Wrice, 954 F.2d 406,
411 (6th Cir. 1992). "When a defendant claims that a confession
was coerced, the government bears the burden of proving by a
preponderance of the evidence that the confession was in fact
voluntary." United States v. Johnson, 351 F.3d 254, 260 (6th
Cir. 2003) (quoting United States v. Mahan, 190 F.3d 416, 422
(6th Cir. 1999)) (internal quotation marks omitted). The Sixth
Circuit

> has established three requirements for a finding that
> a confession was involuntary due to police coercion:
> (i) the police activity was objectively coercive; (ii)

the coercion in question was sufficient to overbear
the defendant's will; and (iii) the alleged police
misconduct was the crucial motivating factor in the
defendant's decision to offer the statement.

Mahan, 190 F.3d at 422) (citing McCall v. Dutton, 863 F.2d
454, 459 (6th Cir. 1988)).

In assessing whether the alleged coercion was sufficient to
overcome the defendant's will, "[r]elevant factors may include
the defendant's age, education and intelligence; whether the
defendant has been informed of his constitutional rights; the
length and extent of the questioning; and the use of physical
punishment, such as the deprivation of food or sleep." Mahan,
190 F.3d at 422–23.

Defendant argues that the following actions on the part of
the police were coercive under the circumstances:

- Defendant was handcuffed and placed in a small room and
  surrounded by police officers three times over the course
  of three days. (ECF No. 177 at 12.)

- Defendant invoked his right to counsel on May 28, yet was
  brought back for questioning on May 29. (Id.)

- Defendant was never told that officers did, in fact, call
  and check on his eighteen-month-old daughter, nor did
  police allow him to call and check on her well being.
  (Id.)

- The police did not allow Defendant to make any phone calls while he was housed at the Bartlett Jail, therefore he was very worried about his daughter's well being. (Id.)

- Defendant claims Hutchison told him, "You give us something, we give you something," meaning that if Defendant confessed or agreed to talk about the robberies, the officers would allow him to make a phone call. (Id.; see also Hr'g Tr., ECF No. 90, at PageID 337:1–5.)

- Defendant was deprived of food, as he had not eaten when he arrived at the Robbery Office at 201 Poplar on May 29. Despite the officers' promise that he would receive food, he was not fed until 10:55 p.m., more than four hours after he arrived, and after he began confessing to the robberies. (ECF No. 177 at 12–13.)

- Defendant was not transported back to the Bartlett Jail until around midnight on May 30, thereby depriving him of sleep. (Id. at 13.)

- Defendant was not permitted to see his daughter or the rest of his family until after five more hours of statements on May 30 and remained shackled during the visit. (Id.)

As a result of the officers' actions, Defendant maintains that his confessions were not voluntary under the circumstances. (Id.)

The Government first argues that Defendant validly waived his _Miranda_ rights after initiating further communication with Hutchison. (ECF No. 181 at 9 (citing ECF No. 104 at 12-13 ("The Court finds that [the Government] has met its burden of showing that Defendant's _Miranda_ waivers were valid.").)

The Government next argues that Defendant has not put forth any credible proof that his statements were coerced. The Government cites this Court's March 10, 2010, Order Denying Defendant's Motion to Suppress, which found that Defendant's assertion that "an improper quid pro quo under which [the officers] would permit [Scott] to speak with his family and/or feed him on the evening of May 29, 2008, if he would confess[,]" was not credible. (ECF No. 181 at 10 (quoting ECF No. 104 at 9).) The Government further notes that this Court has already "reject[ed] Defendant's argument that his statements were the result of an improper agreement with the police." (_Id._ (quoting ECF No. 104 at 9-10).)

On the record before the Court, the Court finds that the Government has met its burden showing that Defendant's confession was not coerced. "When considering a motion to suppress, the trial court is the primary judge of the credibility of witnesses and the weight of the evidence." _Fields v. Bagley_, 275 F.3d 478, 485 n.5 (6th Cir. 2001); _see_ _United States v. Stepp_, 680 F.3d 651, 668 (6th Cir. 2012)

(recognizing this rule); <u>United States v. Massengill</u>, 27 F.

App'x 458, 460 (6th Cir. 2001).   The Court applies the same

rubric in determining a witness's credibility as that set forth

in its jury instructions.   The jury instructions regarding

witness testimony and credibility determinations in the <u>Scott</u>

trial are as follows:

<u>Number of Witnesses, Credibility</u>

    Now, in saying that you must consider all of the
evidence, I do not mean that you must accept all of
the evidence as true or accurate.   You should decide
whether you believe what each witness had to say, and
how important that testimony was.   In making that
decision you may believe or disbelieve any witness, in
whole or in part.   Also, the number of witnesses
testifying concerning any particular dispute is not
controlling.   You may decide that the testimony of a
smaller number of witnesses concerning any fact in
dispute is more believable than the testimony of a
larger number of witnesses to the contrary.

    In deciding whether you believe or do not believe
any witness, I suggest that you ask yourself a few
questions: Did the person impress you as one who was
telling the truth?   Did the witness have any
particular reason not to tell the truth?   Did the
witness have a personal interest in the outcome of the
case?   Did the witness seem to have a good memory?
Did the witness have the opportunity and ability to
observe accurately the things the witness testified
about?   Did the witness appear to understand the
questions clearly and answer them directly?   Did the
witness's testimony differ from the testimony of other
witnesses?

    You should also ask yourself whether there was
evidence tending to prove that the witness testified
falsely concerning some important fact; or, whether
there was evidence that at some other time the witness
said or did something, or failed to say or do

something, which was different from the testimony the witness gave before you during the trial.

The fact that a witness has been previously convicted of a felony offense is another factor you may consider in determining the credibility of the witness.

You should keep in mind, of course, that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth as he or she remembers it, because people naturally tend to forget some things or remember other things inaccurately. So, if a witness has made a misstatement, you need to consider whether that misstatement was simply an innocent lapse of memory or an intentional falsehood; and that may depend on whether it has to do with an important fact or with only an unimportant detail.

(ECF No. 123 at PageID 509-10.)

Statements By Defendant

You have heard evidence that Defendant made a series of statements in which the government claims he admitted certain facts.

It is for you to decide (1) whether the defendant made each statement and (2) if so, how much weight to give each statement. In making those decisions, you should consider all of the evidence about the statement you are considering, including the circumstances under which the statement may have been made and any facts and circumstances tending to corroborate or contradict the version of events described in the statement. You should consider whether each statement was voluntarily and understandingly made. I instruct you that you are to give each statement such weight as you feel it deserves in light of all the evidence.

A statement is made voluntarily if it is made knowingly and without coercion.

(Id. at PageID 514.)

<u>Law Enforcement Witnesses</u>

You have heard the testimony of law enforcement officials. The fact that a witness may be employed by the city, county, state, or federal government as a law enforcement official does not mean that his or her testimony is necessarily deserving of more or less consideration or greater or lesser weight than that of an ordinary witness.

It is your decision, after reviewing all the evidence, whether to accept the testimony of each law enforcement witness and to give to that testimony whatever weight, if any, you find it deserves.

(<u>Id.</u> at PageID 516.)

The Court observed the witnesses and vividly remembers their demeanor and testimony. Sgt. Taylor and Detective Hutchison were highly credible witnesses and were not impeached in any material way.[8] The Defendant, on the other hand, was simply not credible and was severely impeached. His "jogging" testimony was an improvised fabrication contrary to all credible testimony. (See Hr'g Tr., ECF No. 90, at PageID 347:13-17) ("It wasn't so much that I fled from the police, I crossed the street, and I was jogging, and before I know it, the police was behind me.").) While Scott is an intelligent, savvy, articulate, and criminally experienced individual, the Court finds that his statements as both recorded and recalled by the investigating officers on May 28 and 29, 2008, including his

---

[8] Detective Beasley was also believable, but his role in the interview process was limited to May 30, 2008. While his testimony tended to support the facts as stated by Taylor and Hutchison, it is not central to the questions before the Court.

statement regarding his desire to talk with the police and his persistent reinitiation of that contact, were the truth and his testimony given on November 24, 2009, was not. Defendant has put forth no believable evidence to support his claim that his confessions were coerced. Having reviewed the record, the Court finds that under the totality of the circumstances the Government has met its burden to show that Defendant validly waived his <u>Miranda</u> rights and that his confessions were not coerced.

## V. CONCLUSION

For the foregoing reasons, the Court finds that Defendant reinitiated contact with police on the night of May 28, 2008, thereby waiving his previously invoked right to counsel. The Court also finds that Defendant's subsequent <u>Miranda</u> waivers and confessions on May 29 and 30, 2008, were voluntary. As a result, Defendant's First Motion to Suppress is DENIED.

**IT IS SO ORDERED**, this 7th day of May, 2013.


/s/ Jon P. McCalla
CHIEF U.S. DISTRICT JUDGE